# COMMONWEALTH OF MASSACHUSETTS *v.* MELLON, SECRETARY OF THE TREASURY, ET AL.

## IN EQUITY.

# FROTHINGHAM *v.* MELLON, SECRETARY OF THE TREASURY, ET AL.

APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 24, Original, and No. 962.  Argued May 3, 4, 1923.—Decided June 4, 1923.

1. This Court has no jurisdiction of an original proceeding by a State if the matter is not of justiciable character.  P. 480.
2. The Act of November 23, 1921, c. 135, 42 Stat. 224, called the "Maternity Act," authorizes appropriations, to be apportioned among such of the States as shall accept and comply with its provisions, for the purpose of coöperating with them to reduce maternal and infant mortality and to protect the health of mothers and infants; it provides for its administration by a federal bureau in coöperation with state agencies, which are to make such reports of their operations and expenditures as the bureau may prescribe; and that, whenever the bureau shall determine that funds have not been properly expended by any State, payments to that State may be withheld.  In a suit brought in this Court by a State, against the federal officials charged with the administration of the act, who were citizens of other States, to enjoin them from enforcing it, wherein the plaintiff averred that the act is unconstitutional, in that its purpose is to induce the States to yield sovereign rights reserved by them and not granted the Federal Government, under the Constitution, and that the burden of the appropriations falls unequally upon the several States, *held,* that, as the statute does not require the plaintiff to do or yield anything, and as no burden is imposed by it other than that of taxation, which falls, not on the State but on her inhabitants, who are within the federal, as well as the state, taxing power, the complaint resolves down to the naked contention that Congress has usurped reserved powers of the States by the mere enactment of the statute, though nothing has been, or is to be, done under it

without their consent,—an abstract question of political power, not a matter of judicial cognizance. P. 482.

3. A State may not, as *parens patriae,* institute judicial proceedings to protect her citizens (who are no less citizens of the United States), from the operation of a federal statute upon the ground that, as applied to them, it is unconstitutional. P. 485.

4. A suit by an individual, as a past and future federal taxpayer, to restrain the enforcement of an act of Congress authorizing appropriations of public money, upon the ground that the act is invalid, cannot be entertained in equity. P. 486.

5. To invoke the judicial power to disregard a statute as unconstitutional, the party who assails it must show not only that the statute is invalid, but that he has sustained, or is immediately in danger of sustaining, some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally. P. 488.

No. 24, Original. Dismissed.

No. 962. 288 Fed. 252, affirmed.

THE first of these cases was an original suit, brought in this Court by the Commonwealth of Massachusetts, for herself and as representative of her citizens, against the Secretary of the Treasury, the Chief of the Children's Bureau of the Department of Labor, the Surgeon General of the United States Public Health Service, and the United States Commissioner of Education, all of whom were citizens of States other than Massachusetts, and the last three of whom constituted the Board of Maternity and Infant Hygiene created by the above-mentioned act of Congress. The purpose was to enjoin the enforcement of the act. The second case is an appeal from a decree of the Court of Appeals of the District of Columbia, affirming a decree of the Supreme Court of the District, which dismissed a bill brought by the appellant, for the same purpose, against the same defendants.

*Mr. Solicitor General Beck,* with whom *Mr. Robert P. Reeder,* Special Assistant to the Attorney General, was on the brief, for Mellon et al.

I. The bills are fatally defective in that they do not join as parties defendant those States which, by complying with the terms of the act, have become entitled to its benefits. *Texas* v. *Interstate Commerce Commission,* 258 U. S. 158.

II. The actions are essentially against the United States, which may not be sued without its consent. *Kansas* v. *United States,* 204 U. S. 331.

Where plaintiffs have sought to interfere with the performance of official duties by officers of the United States, this Court has held that the actions were, in substance, against the Federal Government, even although they did not affect the title of the United States to property. *Wells* v. *Roper,* 246 U. S. 335; *Louisiana* v. *McAdoo,* 234 U. S. 627; *North Dakota* v. *Chicago & Northwestern Ry. Co.,* 257 U. S. 485.

III. The suit brought by the Commonwealth of Massachusetts is not a controversy between a State and citizens of other States. Jurisdiction may not be based upon that ground.

In substance and effect these suits are against the Children's Bureau and the Board of Maternity and Infant Hygiene. But they are not citizens of any particular State; and the Commonwealth may not make this an action between a State and citizens of another State, and thus within the original jurisdiction of this Court, by naming as defendants the individuals composing the Board and the Chief of the Bureau. *Texas* v. *Interstate Commerce Commission, supra; Bankers Trust Co.* v. *Texas & Pacific Ry. Co.,* 241 U. S. 295.

This Court does not exercise its original jurisdiction upon a mere formal or colorable showing either as to parties or subject-matters. It looks through the form to the real character and substance of the suit. *Wisconsin* v. *Pelican Insurance Co.,* 127 U. S. 265; *Louisiana* v. *Texas,* 176 U. S. 1; *Oklahoma* v. *Atchison T. & S. F. Ry.*

*Co.,* 220 U. S. 277; *Oklahoma* v. *Gulf, Colorado & Santa Fe Ry. Co.,* 220 U. S. 290.

It may be admitted *arguendo* that if suit might be brought solely against the Secretary of the Treasury, although his duties under the act are merely ministerial, the suit need not be dismissed upon jurisdictional grounds. But as the Board and the Bureau are indispensable parties, without which the suit may not proceed, and as their joinder would preclude the basing of jurisdiction upon the ground that the defendants are citizens of States other than the plaintiff State (*Minnesota* v. *Northern Securities Co.,* 184 U. S. 199), the jurisdictional status of the Secretary of the Treasury is not material.

IV. Even if money raised by federal taxes is being misspent, a State may not bring suit in behalf of its citizens. Since the Constitution superseded the Articles of Confederation, the revenues of the United States have not been collected from States but from individuals. The State is here asking the Court to pass upon, not the rights of the State, but the *federal* rights of taxpayers who, while citizens of Massachusetts, are also citizens of the United States and whose payment of federal taxes is in the latter capacity.

It is possible that a State might appeal to the federal courts in cases in which the rights of its citizens *as citizens of the State* were involved; but such rights are not involved in this case. A State certainly may not appeal to the federal courts in cases in which it is seeking to represent the *federal* rights of any number of its citizens. *Oklahoma* v. *Atchison, T. & S. F. Ry. Co.,* 220 U. S. 277; *Oklahoma* v. *Gulf, C. & S. F. Ry. Co.,* 220 U. S. 290, 301. And even if a State might appear in a representative capacity under such circumstances, it would not then have the right to invoke the original jurisdiction of this Court.

V. These actions present no justiciable controversy. The only effect of this law in the plaintiff State is upon the taxpayers as federal taxpayers and not upon the State itself. A very small proportion of the federal revenues raised under general statutes throughout the entire country is appropriated to carry out the purposes of the act. Other than this, the law has no force whatever in any State without the consent of that State. Nothing has been done under it within the limits of Massachusetts. This Court should not be asked to consider whether an opportunity offered to that State and not accepted by it was offered unconstitutionally nor whether other States which are not parties to this proceeding have surrendered any of their constitutional rights. The plaintiff State can not properly invoke the aid of this Court when its own rights are not involved. *Texas v. Interstate Commerce Commission*, 258 U. S. 158.

Nor is the plaintiff in the second of the instant suits in any better position. It is true that she is a taxpayer, but that fact alone will not create a justiciable controversy with respect to an appropriation of government property which may or may not have been derived from taxation. Her liability to pay a general tax remains, whether the appropriation is valid or invalid. No one has ever seriously claimed that a taxpayer could refuse to pay his taxes until he first was advised that the revenues thus raised would be expended for a constitutional purpose. If Congress may not make these appropriations in the promotion of the general welfare, the appellant, Mrs. Frothingham, could not recover any part of taxes which she has already paid, nor could she refuse in future to pay any taxes imposed upon her. Thus her liability as a taxpayer is unaffected by the disposition which Congress in the exercise of its broad political discretion may make of the public revenues or property.

The difficulty of plaintiffs in both the instant cases is that they are asking the Court to determine abstract ques-

tions which do not appreciably or practically affect them. Massachusetts was within her rights in refusing to accept the grant under the law in question. Paying no taxes and not being liable to any, she has no just cause of complaint. Mrs. Frothingham can neither recover taxes already paid nor defend against the imposition of future taxes in whatever amount Congress may in its discretion impose upon her, however the decision in the instant case may be. How, then, has either plaintiff any interest in the question other than as an abstract question of constitutional law? Such questions this Court has uniformly held that it will not answer. *Marye* v. *Parsons,* 114 U. S. 325; *Muskrat* v. *United States,* 219 U. S. 346.

It is true that Massachusetts is a sovereign State, but there are forty-seven other sovereign States. Each one of them has à deep interest in the preservation of our constitutional form of government. But such fact in itself does not give to Massachusetts or to any other State the right to invoke the decision of this Court as to whether an act of Congress is constitutional. Otherwise every act of Congress might be challenged by any one of forty-eight States before it was enforced.

Similarly, Mrs. Frothingham as a taxpayer has an abstract interest in the way the public revenues are appropriated. But there are many million taxpayers (seven millions alone paying an income tax), and as the enforcement of every law presumably requires some expenditure of money by the Federal Government, it cannot be that every taxpayer has a right to challenge a law as unconstitutional because its enforcement requires the expenditure of public moneys and these are in part raised by taxation.

This tribunal is a court and not a council of revision, and as a court it requires that the litigant who invokes its judgment must have some direct, tangible, and practical interest in the question litigated.

VI. The essential questions involved: All that Congress has done under this act has been to offer and give financial aid to those States which wish such support to their own efforts to reduce maternal and infant mortality and to protect the health of mothers and infants. No question of federal taxation is involved; nor is any question of federal regulation, for Congress has not attempted to prescribe the conduct of the States or of their citizens.

The only questions as to the constitutionality of such an act which can arise are whether the appropriations are unauthorized uses of federal funds, to the injury of the federal treasury; whether they are made upon such conditions as to deprive either the States which accept or those which reject the conditions of any constitutional rights; and whether Congress has delegated its legislative power. Massachusetts attempts to raise the first two of these questions, although it seems clear that the State has no proper concern in the question whether the appropriations made under the act squander the funds of the Federal Government.

VII. The power of Congress to make appropriations from the general funds of the United States is almost unlimited. Article I, § 8, cl. 3, of the Constitution confers upon Congress the power to collect taxes in order to make appropriations, and by necessary inference authorizes the making of appropriations. But it is not necessary to rely upon this authority to tax and appropriate, for no tax is necessarily involved; the sole question is whether Congress may appropriate, and Congress has other authority for making appropriations.

The money which is paid out under this act is not earmarked as having been derived from taxes and may not have come into the Treasury from that source or as a result of that power. The Constitution provides that the Government may derive funds from other sources than taxes, and the Constitution provides other authority than

this clause under which Congress may dispose of the financial resources of the Government.

Taxes have not been the only means of replenishing the Treasury. Billions of dollars which were spent in the World War were secured by loans and not by taxation, and a large portion of this money will be repaid without resort to federal taxation. After the war several hundred millions of dollars were recovered by the sale of war supplies; a portion of the money loaned to our Allies has already been repaid; and Germany has paid some of the expenses of our Army. Conceivably all of the cost of a successful war might be met initially by loans and eventually by reparations without any resort whatever to the levying of additional taxes by Congress.

Furthermore, the Government has secured many millions of dollars by the sale of lands which were originally ceded to the United States by the States or purchased from other countries or acquired by conquest or discovery. Many other millions have been obtained by treaties. The current operations of the Government have often been a source of revenue.

Article IV, § 3, clause 2, of the Constitution provides: " The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." The power given is a broad one. *United States* v. *Gratiot,* 14 Peters, 526; *Gibson* v. *Chouteau,* 13 Wall. 92.

The term property, as the Court pointed out in *Dred Scott* v. *Sandford,* 19 How. 393, 436 (see also *Mormon Church* v. *United States,* 136 U. S. 1, 64), includes personal property. Later decisions have shown that it includes money, from whatever source derived. *Pirie* v. *Chicago Title & Trust Co.,* 182 U. S. 438; *Bush* v. *Elliott,* 202 U. S. 477; *In re Louisville National Banking Co.,* 158 Fed. 403; *In re Gilpin,* 160 Fed. 171. See also *Fishburn* v. *Londershausen,* 50 Ore. 363; *Washington County*

v. *Weld County,* 12 Colo. 152; *Williams* v. *State,* 58 Tex. Crim. 82; *State* v. *Parmenter,* 50 Wash. 164; *Fullerton* v. *Young,* 94 N. Y. S. 511; *Mt. Holly Safe Deposit & Trust Co.* v. *Deacon,* 79 N. J. Eq. 120; 18 R. C. L., Tit. " Money," p. 1268; 22 R. C. L., Tit. " Property," p. 43.

In the earliest years of our national existence Congress made a portion, though only a portion, of its donations by grants of tracts of land. No one can doubt that such appropriations were authorized by Article IV. Congress later made a portion of its grants from funds derived from the sale of lands and not from taxation. As to such appropriations, it is obvious that they were authorized by Article IV. So also, where appropriations have been made from the general funds in the Treasury, many million dollars of which were not derived from taxation, it seems clear that, by parity of reasoning, those appropriations were authorized by the same article. Nor is there anything in the broad terms of that provision which restricts it to the disposition of funds derived otherwise than from taxes. The clause broadly empowers Congress to dispose of any of the financial resources of the Federal Government. After property has been acquired by the United States, after funds have been brought into the Treasury and mingled with the other funds there placed, Congress has sweeping power to dispose of those resources.

VIII. This act does not violate any express or implied limitations upon the power of Congress. The only express limitations which the Constitution imposes upon the power of Congress to appropriate money are those which relate to the salaries of the President and the federal judges and provide that no appropriation for the support of the armies shall be for a longer period than two years. Those provisions clearly have no bearing upon this case.

The plaintiff and appellant simply claim that federal taxpayers suffer because of expenditures which are alleged to be unauthorized by the Constitution, that the rights of the States are invaded, and that legislative power is delegated in violation of the Constitution.

IX. The grant of power to appropriate which is contained in the " general welfare " provision is in no wise restricted to the subject-matters upon which Congress may make regulations.

Obviously this clause in Article I does not empower Congress to provide for the general welfare otherwise than through appropriations, for the entire clause relates only to taxation and to the use of the funds raised by taxation.

On the other hand, the clause does not restrict congressional appropriations to the subject-matters upon which Congress may legislate. As to such subject-matters it would have been unnecessary to specifically authorize appropriations, for the final clause in this section broadly empowers Congress to make all laws which shall be necessary and proper for carrying into execution " the foregoing powers."

Even without the " general welfare " provision Congress could, whenever it has authority to impose its will by positive commands, appropriate the money necessary to make its will effective. The clause authorizing Congress by appropriations to provide for the general welfare must, therefore, have a broader purpose than merely to facilitate the exercise of the powers of Congress to impose commands.

Moreover, the grant of power to tax and appropriate, in the first clause of § 8, is distinct from the grants of power in each of the other sixteen clauses of that section, and there is nothing in the sweeping term " to provide for . . . the general welfare " to show that the power to appropriate money was given merely in aid of the grants in those other clauses. See Story, Const., 5th ed., § 913.

X. The overwhelming weight of authority shows that such is the extent of the power of Congress to appropriate money for the general welfare.

From the earliest days of our country's existence statesmen have recognized in their public utterances this broad scope of the power to appropriate for the public welfare; Congress has recognized it in innumerable appropriations of money and property aggregating in value billions of dollars; and those appropriations have never been successfully challenged in this Court. Hamilton: Opinion to Washington, Hamilton's Works, Lodge's ed., III, pp. 179, 217; Report on Manufactures, ibid., pp. 294, 371, 372. Washington: Story Const., 5th ed., note to § 978; First Annual Message, Richardson, Messages and Papers of the Presidents, I, 66; Eighth Annual Message, ibid., 202. Madison: Federalist, No. 41; Richardson, op. cit., II, 485, 568; ibid I, 410. Calhoun: IV Elliot's Debates, 2d ed., p. 431, note; Benton, Abridgment, V, 706, 707. Tucker: Am. State Papers, Misc., II, 443, 446, 447. Monroe: Richardson, II, 142, 144, 162–164, 166, 173. John Quincy Adams: Inaugural Address, Richardson, II, 298; First Annual Message, ib. pp. 306, 307, 311–314; Letter to Stevenson, July 11, 1832. Story: Const., 5th ed., §§ 991, 923, 924. Pomeroy, Intro., Const. Law, §§ 274, 275; Hare, Am. Const. Law, 245, 246; Willoughby, Const., § 269; Burdick, Am. Const., § 77; Corwin, Harv. Law Rev., March, 1923, pp. 569, 575, 577, 584.

XI. This Court has never rendered a decision adverse to such an interpretation of the general welfare clause. *Field* v. *Clark,* 143 U. S. 649; *United States* v. *Realty Co.,* 163 U. S. 427; *Allen* v. *Smith,* 173 U. S. 389.

XII. From the earliest years of the country's history, Congress has repeatedly made appropriations relating to subject-matters which it is not entitled to regulate.

The Constitution was so interpreted by the First Congress, and it has been so interpreted in innumerable instances since then.

Such precedents are so numerous and extend to such an early date as to be entitled to binding force in this Court. *Stuart* v. *Laird,* 1 Cr. 299; Note by Cooley to Story on the Constitution, § 311. See also *United States* v. *Midwest Oil Co.,* 236 U. S. 459, 472, 473; *Martin* v. *Hunter's Lessee,* 1 Wheat. 352; *McCulloch* v. *Maryland,* 4 Wheat. 401; *Field* v. *Clark,* 143 U. S. 691; *Downes* v. *Bidwell,* 182 U. S. 286; *Ogden* v. *Saunders,* 12 Wheat. 290.

XIII. The appropriations made under this act are for the general welfare.

XIV. The contention of the appellant that the appropriations authorized by this act are unrestricted grants to the States and therefore not made for the public welfare is unsound.

XV. The question whether such appropriations are for the general welfare is not a judicial question.

XVI. The act does not undertake to enlarge the governmental powers of any State or state officials.

XVII. The act does not in any way entrench upon the powers of the States.

XVIII. Congress has not by this act delegated legislative power to the Board or the Bureau.

Ours is a dual form of government and thus involves a dual citizenship. Therefore both the Nation and the States have an equal interest in providing that the citizen shall be well born as well as well educated. If the newborn child is a citizen of the State in which he is born, he is equally a citizen of the United States, in which he is also born. Both governmental entities have a direct and practical interest in the new citizen. Undoubtedly the child as life advances will have many relations to the social unit, as to which the State is solely competent to deal. But it is equally true that as a citizen of the United States the new citizen will, if he lives, have many relations to the Federal Government as voter, taxpayer, and possible soldier, as to which the government is legally

competent to deal.   Both the Nation and the States, therefore, have a direct and practical interest that the citizen shall not only have a *" mens sana "* but that it shall also be *" in corpore sano,"* and the latter consideration of a healthy, vigorous life not infrequently depends upon the conditions of birth.   Moreover, the mothers of America give to both State and Nation their future citizens, and it seems a strange doctrine to contend that while the State has a legitimate interest in the preservation of women from the perils of maternity, the United States has not an equal interest.

I have already quoted from the wise words of Washington in his final message to Congress, in recommending the establishment of a national university for the wise education of the American youth.   He recognized the direct interest that the United States has in the intellectual welfare of its citizens; and, if it has such interest, why has it not an equal interest in the physical welfare of its future citizens?

The law presents another method of coöperation between the Nation and the States with respect to the general welfare.

The time is past, if any such time ever were, when our Government can be divided into two noncommunicating compartments.   If separate compartments at all, the potent agencies of steam and electricity have made them communicating.   *Hoke* v. *United States,* 227 U. S. 308, 322.

*Mr. Alexander Lincoln,* Assistant Attorney General, with whom *Mr. Jay R. Benton,* Attorney General, was on the brief, for the Commonwealth of Massachusetts.

I. The act is unconstitutional.   It purports to vest in agencies of the Federal Government powers which are almost wholly undefined, in matters relating to maternity and infancy, and to authorize appropriations of federal funds for the purposes of the act.

Section 8 provides that " any State desiring to receive the benefits of this Act shall, by its agency described in section 4, submit to the Children's Bureau detailed plans for carrying out the provisions of this Act within such State, which plans shall be subject to the approval of the board." What are " the provisions of this Act " to which this section refers? We find none except the statement of the purpose of the act, that it is for the promotion of the welfare and hygiene of maternity and infancy. The " detailed plans " then, except in so far as their provisions are otherwise limited by the act, may contain any provisions which may reasonably be thought to be suitable for the accomplishment of that purpose. There are certain limitations restricting the power of state or federal agents to enter homes, or to take charge of children against the objection of parents or others having custody of them, and preserving the right of parents and others in similar relations to decide concerning the treatment or correction to be applied. Moneys to be appropriated by the States are not to be used for maternity or infancy pensions or gratuities. But otherwise the field is open; the plans may contain any provisions reasonably adaptive to the purpose stated.

Many examples may be given and were stated in the debates on the bill in Congress of regulations which may be imposed under the act. The forced registration of pregnancy, governmental prenatal examination of expectant mothers, restrictions on the right of a woman to secure the services of a midwife or physician of her own selection, are measures to which the people of those States which accept its provisions may be subjected. There is nothing which prohibits the payment of subsidies out of federal appropriations. Insurance of mothers may be made compulsory. The teaching of birth control and physical inspection of persons about to marry may be required.

By § 4 the Children's Bureau is given all necessary powers to coöperate with the state agencies in the admin-

istration of the act.   Hence it is given the power to assist in the enforcement of the plans submitted to it, and for that purpose by its agents to go into the several States and to do those acts for which the plans submitted may provide.   As to what those plans shall provide the final arbiters are the Bureau and the Board.   The fact that it was considered necessary in explicit terms to preserve from invasion by federal officials the right of the parent to the custody and care of his child and the sanctity of his home shows how far reaching are the powers which were intended to be granted by the act.

On the other hand, the freedom of action of the States in the same field is largely controlled by the requirements that the state agencies shall submit to the Children's Bureau detailed plans for carrying out the provisions of the act and shall make reports of their operations and expenditures, which plans and reports must be approved as a prerequisite to the receiving of appropriations; and the States are also required to make appropriations to match federal appropriations, the expenditure of which is subject to the same supervision.   No effective control is secured to the States by § 14, providing that " This Act shall be construed as intending to secure to the various States control of the administration of this Act within their respective States, subject only to the provisions and purposes of this Act," for the powers of the federal agencies under the act are in no degree curtailed by that provision.

(1) The act is invalid because it assumes powers not granted to Congress and usurps the local police power. *McCulloch* v. *Maryland,* 4 Wheat. 316, 405; *United States* v. *Cruikshank,* 92 U. S. 542, 549–551.

This Court has several times declared that the power of the States to regulate their internal affairs and to provide for the general welfare of their people is inherent and exclusive, and has never been surrendered to the

United States. *New York* v. *Miln,* 11 Pet. 102; *In re Rahrer,* 140 U. S. 545; *Kansas* v. *Colorado,* 206 U. S. 46; *Hammer* v. *Dagenhart,* 247 U. S. 251; *Lane County* v. *Oregon,* 7 Wall. 71; *Barbier* v. *Connolly,* 113 U. S. 27; *Keller* v. *United States,* 213 U. S. 138; Federalist, No. 45.

It appears from the debates in Congress that the proponents of this measure have attempted to defend it on the ground that Congress under the Constitution has power to provide for the general welfare of the people of the United States. The words " general welfare " occur twice in the Constitution, once in the preamble and once in Art. I, § 8. The preamble, however, contains no grant of power. It is a mere statement of the purposes effected by the Constitution itself. *Jacobson* v. *Massachusetts,* 197 U. S. 11; Story, Const., 5th ed., § 462.

We pass, therefore, to a consideration of Art. I, § 8. It is plain that the words " to pay the debts and provide for the common defence and general welfare of the United States " are not a substantive grant of power, but a qualification of the first enumerated power " to lay and collect taxes, duties, imposts and excises." 5 Elliot's Debates, pp. 378, 451, 462, 476, 477, 506, 507, 543; I Curtis, Const. History of United States, pp. 518–521, 728 note, 731; *Loughborough* v. *Blake,* 5 Wheat. 317; *Ward* v. *Maryland,* 12 Wall. 418; *United States* v. *Boyer,* 85 Fed. 425; Story, Const., 5th ed., §§ 906–911; Miller, Const. of United States, pp. 229–231.

The source of the power to make appropriations, it is generally conceded, is to be found in the grant of the taxing power. *Field* v. *Clark,* 143 U. S. 649; *United States* v. *Realty Co.,* 163 U. S. 427; Story, Const., 5th ed., §§ 923, 976.

The defendants, indeed, contend that the power to make apropriations may be derived also from Art. IV, § 3, cl. 2; that this clause broadly empowers Congress to dispose of any of the financial resources of the Federal

Government, and that therefore the power to make appropriations from the general funds is almost without limit.  But this provision has never been interpreted as having so broad a scope.  It is regarded as applying to the public lands and not to funds in the Treasury.  In *De Lima* v. *Bidwell,* 182 U. S. 1, 196, it is called " the territorial clause."  Cf. *Gibson* v. *Chouteau,* 13 Wall. 92; *Dred Scott* v. *Sandford,* 19 How. 393; *Kansas* v. *Colorado,* 206 U. S. 46; *Light* v. *United States,* 220 U. S. 523.

The controversy has not been whether the power to appropriate is broader than the taxing power, but how both powers may be affected by the general welfare clause.

Hamilton held that, under the general welfare. clause, the revenues of the United States can be raised or appropriated for any public purpose connected with the general welfare of the United States.  This doctrine was stated in his Report on Manufactures, in 1791 (Story Const., 5th ed., § 978).  It was adopted and followed by Story (§§ 975–992).  Madison, on the other hand, held that the general welfare clause is merely descriptive of and limited by the specific grants of power to Congress contained in § 8, and that the power to tax and appropriate is therefore confined to the enumerated powers.  Madison expressed this view in the Federalist, No. 41, and the statement there made must be presumed to have had some effect in obtaining the ratification of the Constitution by the States.  He renewed the same statement in his message vetoing a bill for internal improvements, March 3, 1817 (4 Elliot's Debates, pp. 468–470), and in a letter to Andrew Stevenson, dated November 27, 1830 (4 Madison's Works, pp. 120–139).  Madison's view was supported and emphasized by Jefferson, as stated in his Opinion on the Constitutionality of a National Bank, February 15, 1791 (Federalist, ed. by Paul L. Ford, pp. 651–655).  See Tucker Const. of United States, §§ 222–231.

The view that the general welfare clause, in its effect on the power to tax and appropriate, is limited by the substantive grants of power which follow, is at least consistent with a reasonable interpretation of § 8. If the grant of the taxing power had been retained in its original form, without the qualifying clauses, there could have been little doubt but that the power either to tax or to appropriate revenue could have been exercised only for purposes within the field of the enumerated powers. The power to tax is an auxiliary power coextensive with the general legislative powers of government. *Lowell* v. *Boston,* 111 Mass. 454; *Loan Association* v. *Topeka,* 20 Wall. 655; *Northern Liberties* v. *St. John's Church,* 13 Pa. St. 104.

The qualifying clauses, however, as matter of history were not added to extend the taxing power. Modification was proposed in order that there might be an express provision for payment of the debts of the United States, and one purpose being added it was necessary to make some reference to other necessary purposes, to avoid the possibility of a construction which would exclude them. The remaining enumerated powers all relate to matters of the common defence or general welfare of the United States. " Common defence " and " general welfare " were therefore apt words to describe objects of taxation which would include all purposes for the promotion of which Congress, in § 8, was given substantive power to provide. If those words are to be construed as having been used with that intention, then the objects of the powers expressly granted (with the implied powers which flow from them) are particulars for which alone Congress has the power to tax and to make expenditures. Story, Const., 5th ed., § 930; *Gibbons* v. *Ogden,* 9 Wheat. 1, 199; *Dobbins* v. *Commissioners of Erie County,* 16 Pet. 435; *Veazie Bank* v. *Fenno,* 8 Wall. 533; *Child Labor Tax Case,* 259 U. S. 20. The question was reserved in

*Field* v. *Clark,* 143 U. S. 649, and in *United States* v. *Realty Co.,* 163 U. S. 427.

The objections to the act go further in that the proposed appropriations are not *general* in their application, but are confined to those States which accept the act and appropriate their own funds to be used for its purposes. Hamilton in his Report on Manufactures, cited above, although contending for the broad power of appropriation, says: " The only qualification of the generality of the phrase in question, which seems to be admissible, is this, that the object to which an appropriation of money is to be made must be *general* and not *local,*—its operation extending in fact, or by possibility, throughout the Union, and not being confined to a particular spot ". Story, Const., 5th ed., § 978; Tucker, Const., § 225.

It must be doubtful whether on any theory Congress has the power to appropriate to the States, according to a fixed method of apportionment, revenues raised from the people of the United States for national purposes. But an appropriation by Congress discriminating between States which accept its conditions and make appropriations to match and States which do not, it is submitted, is on its face purely arbitrary, having no legitimate relation to the general welfare of the country, and cannot be for the " general welfare of the United States ". Would any one say for example that Congress could appropriate money for the maintenance of post office facilities or for the pay of federal judges in those States only which should contribute equally towards such expenses, thereby manifestly attempting to coerce the States into contributing to the support of the United States Government? Such a proposition would seem to be absurd.

An examination of acts of Congress which have been referred to in debates as examples of legislation resting for its validity on the general welfare clause, and of other acts which may be considered to belong in the same class,

·will, it is believed, show that there has not been in the past any intentional reliance by Congress on the general welfare clause for support, but that, on the contrary, legislation which touches upon the health, morals, education and prosperity of the people of the United States has been founded on, and in many cases upheld by the Court as an exercise of, some specific power contained in the Constitution. It will be strikingly evident, however, that the amount of such legislation has increased greatly in recent years, and that it is now taking a prominent place in the field of congressional action. There is now exhibited what may be conservatively called a tendency, with regard to many subjects of internal police regulation, towards nationalization of such subjects (to adopt the expression used by this Court in *Heisler* v. *Thomas Colliery Co.*, 260 U. S. 245).

A number of statutes relating to the public health or morals have been upheld by this Court as having been passed either in the exercise of the taxing power, or of the power over interstate and foreign commerce, or of the power to regulate the use of the mails. The Court has gone far in some cases to sustain such acts, where the inference was reasonable that the purpose of the act was to impose a regulation in a matter not subject to the control of Congress, but the Court declined to interfere for the reason that it was not within the judicial power to inquire into the purposes or motives of the legislative branch of the government. Instances of such acts and of decisions holding them constitutional are the following:

Oleomargarine Acts: *In re Kollock*, 165 U. S. 526; *McCray* v. *United States*, 195 U. S. 27. Lottery Acts: *Ex parte Jackson*, 96 U. S. 727; *In re Rapier*, 143 U. S. 110; *Lottery Case*, 188 U. S. 321. Pure Food and Drug Act: *Hipolite Egg Co.* v. *United States*, 220 U. S. 45. White Slave Traffic Act: *Hoke* v. *United States*, 227 U. S. 308;

*Caminetti* v. *United States,* 242 U. S. 470. Harrison Narcotic Drug Act: *United States* v. *Jin Fuey Moy,* 241 U. S. 394; *United States* v. *Doremus,* 249 U. S. 86. Acts regulating interstate transportation of intoxicating liquors: *Clark Distilling Co.* v. *Western Maryland Ry. Co.,* 242 U. S. 311; *United States* v. *Hill,* 248 U. S. 420.

In more recent cases, however, the Court has shown that there are limits to the power of Congress to pass legislation purporting to be based on one of the powers expressly granted to Congress which in fact usurps the reserved powers of the States, and that laws showing on their face detailed regulation of a matter wholly within the police power of the States will be held to be unconstitutional although they purport to be passed in the exercise of some constitutional power. *Hammer* v. *Dagenhart,* 247 U. S. 251; *Child Labor Tax Case,* 259 U. S. 20; *Hill* v. *Wallace,* 259 U. S. 44.

Various bureaus and boards have been established by Congress and appropriations made for investigations and reports on different subjects. Among these may be mentioned: The Bureau of Education, the Geological Survey, the Bureau of Mines, the Weather Bureau, the Bureau of Animal Industry, the Bureau of Plant Industry, the Bureau of Markets, the Bureau of Soils, the Bureau of Fisheries, the Bureau of Labor Statistics, the Children's Bureau, the Public Health Service, and the Smithsonian Institution. There is no express provision of the Constitution giving Congress the power to establish offices and make appropriations for the collection of valuable information. The power of Congress to make such provision, however, may well be implied from the powers expressly granted and the power, given by Art. I, § 8, " to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States or in any department or

officer thereof." In many respects the information thus collected may be useful for carrying into execution the express powers of the Federal Government, and the acts referred to may be sustainable within the rule laid down in *McCulloch* v. *Maryland,* 4 Wheat. 316, 421. See *United States* v. *Gettysburg Electric Ry.,* 160 U. S. 668, 680–683.

It should be observed that such acts as these constitute no interference with the rights of the States reserved by the Tenth Amendment.

The act is not made valid by the circumstance that federal powers are to be exercised only with respect to those States which accept the act, for Congress cannot assume, and state legislatures cannot yield, the powers reserved to the States by the Constitution. Message of President Monroe, May 4, 1822; 4 Elliot's Debates, p. 525; *Pollard's Lessee* v. *Hagan,* 3 How. 212; *Escanaba Co.* v. *Chicago,* 107 U. S. 678; *Coyle* v. *Oklahoma,* 221 U. S. 559; *Cincinnati* v. *Louisville & Nashville R. R. Co.,* 223 U. S. 390.

(2) The act is invalid because it imposes on each State an illegal option either to yield a part of its powers reserved by the Tenth Amendment or to give up its share of appropriations under the act.

A statute attempting, by imposing conditions upon a general privilege, to exact a waiver of a constitutional right, is null and void. *Harrison* v. *St. Louis & San Francisco R. R. Co.,* 232 U. S. 318; *Terral* v. *Burke Construction Co.,* 257 U. S. 529.

(3) The act is invalid because it sets up a system of government by coöperation between the Federal Government and certain of the States, not provided by the Constitution.

Congress cannot make laws for the States, and it cannot delegate to the States the power to make laws for the United States. *In re Rahrer,* 140 U. S. 545; *Knicker-*

*bocker Ice Co.* v. *Stewart,* 253 U. S. 149; *Opinion of the Justices,* 239 Mass. 606.

Each sovereignty executes its own laws and not the laws of any other. The Constitution provides, by Art. II, § 1, that the executive power shall be vested in the President. The laws passed by Congress are in theory executed by the President, although they may be administered by departments, bureaus and commissions established by Congress. *Wilcox* v. *Jackson,* 13 Pet. 498; *United States* v. *Farden,* 99 U. S. 10; *Wolsey* v. *Chapman,* 101 U. S. 755; *Runkle* v. *United States,* 122 U. S. 543; *Jones* v. *United States,* 137 U. S. 202; 7 Ops. Atty. Gen. 453.

The powers and duties of all federal bodies and officials are to administer federal law, and that law alone. In the performance of their official duties they have no power to administer state laws. The Constitution, Art. II, § 3, requires the President to " take care that the laws be faithfully executed ",—that is the laws of the United States. 8 Ops. Atty. Gen. 8, 11.

The Constitution does not contemplate a government by coöperation between the United States and the several States in the enforcement of joint laws. On the contrary the two governments, federal and state, are entirely distinct, each being supreme in its separate sphere. *Collector* v. *Day,* 11 Wall. 113; *Matter of Heff,* 197 U. S. 488. " The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States." *Texas* v. *White,* 7 Wall. 700, 725; *Keller* v. *United States,* 213 U. S. 138, 149.

A system of government by coöperation between the United States and some of the States, from which others are excluded, is still more objectionable.

The proposition here made does not go to the length of asserting that there may not be coöperation between the Federal Government and the States in the enforcement of their respective laws where they are not in con-

flict, or that Congress may not make appropriations conditioned on expenditures by States, municipalities or other contributors for projects in which each has a legitimate interest. But coöperation between the Federal Government and States which match appropriations, in the preparation and enforcement of " plans " which are intended to have the force of laws emanating jointly from both sovereignties,—coöperation in activities which have to do with the internal affairs of the States and have no relation to the enumerated powers of Congress, is quite a different matter.

The act is invalid because it purports to delegate congressional powers to state agencies and administrative boards.

II. Massachusetts has an interest in the case presented sufficient to entitle it to sue as party plaintiff.

(1) The imposition on the plaintiff of an option either to yield a part of its powers reserved by the Tenth Amendment or to give up its share of appropriations under the act gives the plaintiff a sufficient interest to maintain this suit.

If the act empowered federal officials to administer and enforce provisions for promoting the welfare and hygiene of maternity and infancy in the several States without their consent, it would be unconstitutional, if the plaintiff's contention is sound, as an invasion of the reserved powers of the States. If so the plaintiff would clearly have an interest enabling it to maintain a suit to prevent such violation of its rights by the enforcement of the act. *Ableman* v. *Booth,* 21 How. 506; *Gordon* v. *United States,* 117 U. S. 697; *Matter of Heff,* 197 U. S. 488; *South Carolina* v. *United States,* 199 U. S. 437; *Missouri* v. *Holland,* 252 U. S. 416; *Harrison* v. *St. Louis & San Francisco R. R.,* 232 U. S. 318; *Terral* v. *Burke Construction Co.,* 257 U. S. 529.

(2) The establishment by the act of a system of government by coöperation between the United States and

the States accepting the act, from which the plaintiff is excluded, gives the plaintiff a sufficient interest, in order that it may be restored to its position as one of the States in a Federal Union. *Texas* v. *White,* 7 Wall. 700; *South Carolina* v. *United States,* 199 U. S. 437.

(3) The exclusion of the plaintiff from the benefits of appropriations which are not general, but are made for the benefit of certain of the States only, gives the plaintiff a sufficient interest.

(4) The fact that revenues available for state taxation are diminished by federal taxation imposed to execute an unconstitutional law gives the plaintiff a sufficient interest. *Collector* v. *Day,* 11 Wall. 113. Cf. *Missouri* v. *Holland,* 252 U. S. 416.

(5) The plaintiff is also interested in maintaining the suit as the representative of its citizens because their rights are invaded.

The question whether a State may sue in this Court by original bill as *parens patriae* or representative of its citizens was presented but not settled in *Louisiana* v. *Texas,* 176 U. S. 1. But later decisions have made it plain that such suits by States will lie for the protection of the personal and property rights and welfare of their citizens generally. *Missouri* v. *Illinois,* 180 U. S. 208; *Kansas* v. *Colorado,* 185 U. S. 125; s. c. 206 U. S. 46; *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230; *New York* v. *New Jersey,* 256 U. S. 296.

Cases holding that the original jurisdiction of this Court does not extend to suits by States for the protection of their citizens against violation of their laws by others are readily distinguishable. *Oklahoma* v. *Atchison, Topeka & Santa Fe Ry. Co.,* 220 U. S. 277; *Oklahoma* v. *Gulf, Colorado & Santa Fe Ry. Co.,* 220 U. S. 290.

III. The suit is properly brought against the defendants named in the bill and they may be enjoined from

proceeding under the act although they are federal officials. *Philadelphia Co.* v. *Stimson*, 223 U. S. 605; *Wilson* v. *New*, 243 U. S. 332; *Hammer* v. *Dagenhart*, 247 U. S. 251; *Hill* v. *Wallace*, 259 U. S. 44; *Missouri* v. *Holland*, 252 U. S. 416; *National Prohibition Cases*, 253 U. S. 350.

IV. The suit involves a justiciable controversy.

Since the bill shows that the defendants have proceeded and are proceeding to enforce the act, there is manifestly an actual controversy involving the constitutional question in the determination of the plaintiff's right; and the question whether an act of Congress is in violation of the reserved powers of the States is clearly justiciable. *Rhode Island* v. *Massachusetts*, 12 Pet. 657; *Missouri* v. *Holland*, 252 U. S. 416; *National Prohibition Cases*, 253 U. S. 350.

The controversy does not call for the decision of a political question. *Georgia* v. *Stanton*, 6 Wall. 50, distinguished.

The doctrine that a State cannot sue to protect its sovereign rights, where rights of property are not involved, has now been completely refuted, and it has been said that in such cases jurisdiction will be accepted where the controversy can be judicially determined, for the reasons first stated by the Court in *Rhode Island* v. *Massachusetts, supra. Virginia* v. *West Virginia*, 11 Wall. 39; *Kansas* v. *Colorado*, 206 U. S. 46; *Georgia* v. *Tennessee Copper Co.*, 206 U. S. 230; *Missouri* v. *Holland*, 252 U. S. 416.

There is one class of cases where the Court has uniformly declined to act. Those are cases where the Court has been asked to decide what is the established government in a State, and to enforce the constitutional guaranty of a republican form of government under Const., Art. IV, § 4. *Luther* v. *Borden*, 7 How. 1; *Taylor & Marshall* v. *Beckham*, 178 U. S. 548; *Pacific Tel. Co.* v. *Oregon*, 223 U. S. 118; *Davis* v. *Ohio*, 241 U. S. 565; *Mountain Timber Co.* v. *Washington*, 243 U. S. 219.

V. The suit is within the original jurisdiction of this Court.

·The defendants named in the bill are citizens of other States who occupy the offices described therein. The suit is, therefore, a controversy of a civil nature in which a State is plaintiff and citizens of other States, but not of one other State, are defendants. Const., Art. III, § 2, extends the judicial power of the United States to controversies " between a State and citizens of another State ", while § 13 of the Judiciary Act and all subsequent reënactments use the words " between a State and citizens of other States." This controversy then is one of which this Court has original jurisdiction. The words " citizens of another State ", in the Constitution, do not limit the jurisdiction to cases where the defendants are citizens of one other State. *Wisconsin* v. *Pelican Ins. Co.,* 127 U. S. 265; *Texas* v. *White,* 7 Wall. 700; *Alabama* v. *Burr,* 115 U. S. 413; *National Prohibition Cases,* 253 U. S. 350.

If the act is unconstitutional as alleged, the defendants who have been acting individually or collectively under color of its authority cannot justify their action, and are subject to judicial restraint. *Philadelphia Co.* v. *Stimson,* 223 U. S. 605. The fact that some of the defendants have been purporting to act as a board is immaterial. If their action is unauthorized they may be individually restrained. *Board of Liquidation* v. *McComb,* 92 U. S. 531; *Pennoyer* v. *McConnaughy,* 140 U. S. 1; *Smyth* v. *Ames,* 169 U. S. 466; *Greene* v. *Louisville & Interurban R. R. Co.,* 244 U. S. 499.

The Bureau and the Board, are not indispensable parties without which the suit may not proceed because: First, they are not separate entities. Cf. *United States* v. *Strang,* 254 U. S. 491; *Sloan Shipyards* v. *U. S. Emergency Fleet Corp.,* 258 U. S. 549. Secondly, if they were separate entities, the mere fact that powers and duties under the act are delegated to them does not make them indispensable parties. There are many cases where persons to whom powers and duties are assigned under

statutes alleged to be unconstitutional have not been parties to suits to restrain their enforcement, and it has never been hinted that the omission constituted a defect.  See e. g., *Hill* v. *Wallace,* 259 U. S. 44.

VI. The bill of complaint is not defective for want of essential parties defendant. *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U. S. 362; *Shields* v. *Barrow,* 17 How. 130; *Elmendorf* v. *Taylor,* 10 Wheat. 152; *Barney* v. *Baltimore City,* 6 Wall. 280.  *Texas* v. *Interstate Commerce Commission,* 258 U. S. 158, distinguished.

It has never been suggested that an original bill by a State in this Court to restrain action under an act of Congress alleged to be unconstitutional should be brought formally in behalf of other States or that other States generally should be joined as parties.  The practice has been to the contrary.  *Missouri* v. *Holland,* 252 U. S. 416; *National Prohibition Cases,* 253 U. S. 350; *Western Union Tel. Co.* v. *Andrews,* 216 U. S. 165; *Greene* v. *Louisville & Interurban R. R. Co.,* 244 U. S. 499; *Osborn* v. *United States Bank,* 9 Wheat. 738; *Pennoyer* v. *McConnaughy,* 140 U. S. 1; *Smyth* v. *Ames,* 169 U. S. 466; *Ex parte Young,* 209 U. S. 123; *Truax* v. *Raich,* 239 U. S. 33.

VII. Growth and danger of " Federal Aid " legislation. The bill contains allegations, admitted by the motion to dismiss, that so-called " Federal Aid " legislation by Congress, by which appropriations are made by Congress for local and not national purposes, to States which accept the federal grants and appropriate equal amounts to be spent under federal direction, has been found to be an effective way to induce States to yield a portion of their sovereign rights; that bills of a similar nature calling for expenditures of immense sums of money, such as an Education Bill and a bill to create a Department of Public Welfare, are now pending or proposed, and that, unless checked by this Court on the ground of unconstitutionality, no limit can be foreseen to the amounts which may

thus be expended for matters of local concern, resulting in the establishment of large federal bureaus with many officers for the performance of duties entirely outside the purview of the Constitution.

The case is one of large import. If the issue should seem to the Court in any respect doubtful, then, as bearing on the intention of the framers of the Constitution, the purpose of which was to form an enduring Union of sovereign States, we conceive it to be permissible and proper to call attention to the magnitude and extent of the forces by which, through the medium of this modern scheme of legislation, the structure of our Federal Government is being broken down.

*Mr. William L. Rawls,* with whom *Mr. George Arnold Frick* and *Mr. William H. Lamar* were on the brief, for appellant in No. 962.

It has been held with practical uniformity by the Courts of the various States that a taxpayer has a sufficient interest to entitle him to maintain a suit against a public officer for the purpose of enjoining an unauthorized payment of public funds or disposition of public property. II Cooley, Taxation, 1435; IV Dillon, Municipal Corporations, § 1579.

This right of a taxpayer to enjoin such action on the part of a state or municipal officer has been recognized by this Court. *Crampton* v. *Zabriskie,* 101 U. S. 601, 609; *Brown* v. *Trousdale,* 138 U. S. 389; *Calvin* v. *Jacksonville,* 158 U. S. 456; *Ogden City* v. *Armstrong,* 168 U. S. 224, 236; *Hawke* v. *Smith,* 253 U. S. 221, 224.

This Court has in other cases permitted a proceeding to be maintained by one of a large class affected by a law alleged to be invalid, for the purpose of enjoining a public officer from executing it. *Hammer* v. *Dagenhart,* 247 U. S. 251; *Truax* v. *Raich,* 239 U. S. 33; *Millard* v. *Roberts,* 202 U. S. 429.

The right of a taxpayer to maintain a suit to enjoin an alleged unauthorized payment of public moneys from the Treasury of the United States had been expressly adjudicated by the Court of Appeals of the District. *Roberts* v. *Bradfield,* 12 App. D. C. 453. That case came upon appeal to this Court and was decided upon its merits, the question of the right of a taxpayer to maintain such a suit not being discussed. 175 U. S. 291.

It is submitted that there is no distinction, so far as the right of a taxpayer to maintain a suit is concerned, between an officer of a State who is about to make an unauthorized expenditure of public money and an officer of the Federal Government who threatens to do the same thing. Both are subject to the law and must find valid authority for all of their acts. In so far as they exceed the authority conferred upon them, their acts are void. This principle is of uniform application. *Mott* v. *Pennsylvania R. R. Co.,* 30 Pa. St. 9.

This Court in numerous decisions has laid down the rule that all governmental officers or agencies are subject to judicial restraint where they attempt to act in excess of authority. *Osborn* v. *United States Bank,* 9 Wheat. 739; *Board of Liquidation* v. *McComb,* 92 U. S. 531; *United States* v. *Lee,* 106 U. S. 196; *Virginia Coupon Cases,* 114 U. S. 311; *Pennoyer* v. *McConnaughy,* 140 U. S. 1; *Scott* v. *Donald,* 165 U. S. 107; *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U. S. 362; *Smyth* v. *Ames,* 169 U. S. 466; *Ex Parte Young,* 209 U. S. 123.

Likewise, where a sufficient interest in the plaintiff has been shown, this Court has always recognized his right to maintain a suit to enjoin the head of a department of the Federal Government from committing an unauthorized act to the plaintiff's injury. *Noble* v. *Union River Logging R. R.,* 147 U. S. 165; *Philadelphia Co.* v. *Stimson,* 223 U. S. 605.

The appellant maintains that the so-called 'Sheppard-Towner Act is null and void because it is in violation of

the Constitution of the United States and no authority is conferred thereby upon the Secretary of the. Treasury to make any of the payments mentioned therein. If these payments are made, this plaintiff will suffer a direct injury in that she will be subjected to taxation to pay her proportionate part of such unauthorized. payments. She, therefore, has an interest sufficient under the practically uniform decisions of the courts of this country to enable her to maintain a proceeding to enjoin the making of these payments. Her relation to these funds is exactly that of a *cestui que trust* to funds held by his trustee. Her injury would be irreparable because it cannot be calculated. She can resort only to equity to maintain her right.

The proper parties are before the Court.

The act in question is invalid because it attempts to authorize the appropriation of money out of the Treasury of the United States for purposes wholly outside of any authority or power conferred upon the Government of the United States by the Constitution.

Granting, for the. sake of the argument, that Congress had the power to appropriate money out of the Treasury of the United States for the purpose specified therein, the act is still unconstitutional and void because its provisions go beyond the exercise of such power of appropriation and constitute substantive legislation with respect to matters manifestly beyond the legislative power conferred upon Congress by the Constitution.

The act is invalid because it amounts to a delegation to a subordinate agency by Congress of legislative power in violation of the Constitution.

*Mr. J. Weston Allen* and *Mr. Edwin H. Abbot, Jr.,* filed a supplemental brief on behalf of appellant in No. 962.

Congress has no power to appropriate public money to promote the welfare and hygiene of maternity and infancy in the several States.

Article I, § 8, cl. 18, restricts the power to appropriate public money, to ends within the scope of the powers vested by the Constitution in the United States.

To hold that the United States may appropriate money to execute the reserved powers of the States is to confer, by construction, a new substantive power.

The act is invalid as an attempt to make a virtual amendment of the Constitution by compact with the States.

*Messrs. Charles I. Dawson, George W. Woodruff, John R. Saunders, Clifford L. Hilton, Russell W. Fleming, S. B. Townsend, Jr., U. S. Lesh, J. S. Utley, John W. Murphy,* and *C. C. Crabbe,* Attorneys General respectively of Kentucky, Pennsylvania, Virginia, Minnesota, Colorado, Delaware, Indiana, Arkansas, Arizona and Ohio, by leave of court, filed a brief as *amici curiæ,* on behalf of those States, in No. 24, Original.

*Mr. Charles K. Burdick,* by leave of court, filed a brief as *amicus curiæ* on behalf of the Association of Land-Grant Colleges, in No. 24, Original.

*Mr. Everett P. Wheeler* and *Mr. Waldo G. Morse,* by leave of court, filed a brief as *amici curiæ,* in both cases.

*Mr. Henry St. George Tucker,* by leave of court, filed a brief as *amicus curiæ,* in No. 962.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

These cases were argued and will be considered and disposed of together. The first is an original suit in this Court. The other was brought in the Supreme Court of the District of Columbia. That court dismissed the bill and its decree was affirmed by the District Court of Appeals. Thereupon the case was brought here by ap-

peal.   Both cases challenge the constitutionality of the Act of November 23, 1921, c. 135, 42 Stat. 224, commonly called the Maternity Act.   Briefly, it provides for an initial appropriation and thereafter annual appropriations for a period of five years, to be apportioned among such of the several States as shall accept and comply with its provisions, for the purpose of coöperating with them to reduce maternal and infant mortality and protect the health of mothers and infants.   It creates a bureau to administer the act in coöperation with state agencies, which are required to make such reports concerning their operations and expenditures as may be prescribed by the federal bureau.   Whenever that bureau shall determine that funds have not been properly expended in respect of any State, payments may be withheld.

It is asserted that these appropriations are for purposes not national, but local to the States, and together with numerous similar appropriations constitute an effective means of inducing the States to yield a portion of their sovereign rights.   It is further alleged that the burden of the appropriations provided by this act and similar legislation falls unequally upon the several States, and rests largely upon the industrial States, such as Massachusetts; that the act is a usurpation of power not granted to Congress by the Constitution—an attempted exercise of the power of local self-government reserved to the States by the Tenth Amendment; and that the defendants are proceeding to carry the act into operation. In the *Massachusetts* case it is alleged that the plaintiff's rights and powers as a sovereign State and the rights of its citizens have been invaded and usurped by these expenditures and acts; and that, although the State has not accepted the act, its constitutional rights are infringed by the passage thereof and the imposition upon the State of an illegal and unconstitutional option either to yield to the Federal Government a part of its reserved rights or

lose the share which it would otherwise be entitled to receive of the moneys appropriated. In the *Frothingham* case plaintiff alleges that the effect of the statute will be to take her property, under the guise of taxation, without due process of law.

We have reached the conclusion that the cases must be disposed of for want of jurisdiction without considering the merits of the constitutional questions.

In the first case, the State of Massachusetts presents no justiciable controversy either in its own behalf or as the representative of its citizens. The appellant in the second suit has no such interest in the subject-matter, nor is any such injury inflicted or threatened, as will enable her to sue.

First. The State of Massachusetts in its own behalf, in effect, complains that the act in question invades the local concerns of the State, and is a usurpation of power, viz: the power of local self government reserved to the States.

Probably, it would be sufficient to point out that the powers of the State are not invaded, since the statute imposes no obligation but simply extends an option which the State is free to accept or reject. But we do not rest here. Under Article III, § 2, of the Constitution, the judicial power of this Court extends " to controversies . . . between a State and citizens of another State " and the Court has original jurisdiction " in all cases . . . in which a State shall be party." The effect of this is not to confer jurisdiction upon the Court merely because a State is a party, but only where it is a party to a proceeding of judicial cognizance. Proceedings not of a justiciable character are outside the contemplation of the constitutional grant. In *Wisconsin* v. *Pelican Insurance Co.,* 127 U. S. 265, 289, Mr. Justice Gray, speaking for the Court, said:

"As to ' controversies between a State and citizens of another State.' The object of vesting in the courts of

the United States jurisdiction of suits by one State against the citizens of another was to enable such controversies to be determined by a national tribunal, and thereby to avoid the partiality, or suspicion of partiality, which might exist if the plaintiff State were compelled to resort to the courts of the State of which the defendants were citizens. Federalist No. 80; Chief Justice Jay, in *Chisholm* v. *Georgia,* 2 Dall. 419, 475; Story on the Constitution, §§ 1638, 1682. The grant is of ' judicial power,' and was not intended to confer upon the courts of the United States jurisdiction of a suit or prosecution by the one State, of such a nature that it could not, on the settled principles of public and international law, be entertained by the judiciary of the other State at all."

That was an action brought by the State of Wisconsin to enforce a judgment of one of its own courts for a penalty against a resident of another State, and, in pursuance of the doctrine announced by the language just quoted, this Court declined to assume jurisdiction upon the ground that the courts of no country will execute the penal laws of another.

In an earlier case it was held that a proceeding by mandamus by one State to compel the Governor of another to surrender a fugitive from justice was not within the powers of the judicial department, since the duty of the Governor in the premises was in the nature of a moral rather than a legal obligation. *Kentucky* v. *Dennison,* 24 How. 66, 109. In *New Hampshire* v. *Louisiana; New York* v. *Louisiana,* 108 U. S. 76, this Court declined to take jurisdiction of actions to enforce payment of the bonds of another State for the benefit of the assignors, citizens of the plaintiff States. In *Georgia* v. *Stanton,* 6 Wall. 50, 75, and kindred cases, to which we shall presently refer, jurisdiction was denied in respect of questions of a political or governmental character. On the other hand, jurisdiction was maintained in *Texas* v. *White,* 7

Wall. 700; *Florida* v. *Anderson,* 91 U. S. 667; and *Alabama* v. *Burr,* 115 U. S. 413, because proprietary rights were involved; in *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230, 237, because the right of dominion of the State over the air and soil within its domain was affected; in *Missouri* v. *Holland,* 252 U. S. 416, because, as asserted, there was an invasion, by acts done and threatened, of the quasi-sovereign right of the State to regulate the taking of wild game within its borders; and in other cases because boundaries were in dispute. It is not necessary to cite additional cases. The foregoing, for present purposes, sufficiently indicate the jurisdictional line of demarcation.

What, then, is the nature of the right of the State here asserted and how is it affected by this statute? Reduced to its simplest terms, it is alleged that the statute constitutes an attempt to legislate outside the powers granted to Congress by the Constitution and within the field of local powers exclusively reserved to the States. Nothing is added to the force or effect of this assertion by the further incidental allegations that the ulterior purpose of Congress thereby was to induce the States to yield a portion of their sovereign rights; that the burden of the appropriations falls unequally upon the several States; and that there is imposed upon the States an illegal and unconstitutional option either to yield to the Federal Government a part of their reserved rights or lose their share of the moneys appropriated. But what burden is imposed upon the States, unequally or otherwise? Certainly there is none, unless it be the burden of taxation, and that falls upon their inhabitants, who are within the taxing power of Congress as well as that of the States where they reside. Nor does the statute require the States to do or to yield anything. If Congress enacted it with the ulterior purpose of tempting them to yield, that purpose may be effectively frustrated by the simple expedient of not yielding.

In the last analysis, the complaint of the plaintiff State is brought to the naked contention that Congress has usurped the reserved powers of the several States by the mere enactment of the statute, though nothing has been done and nothing is to be done without their consent; and it is plain that that question, as it is thus presented, is political and not judicial in character, and therefore is not a matter which admits of the exercise of the judicial power.

In *Georgia* v. *Stanton, supra,* this Court held that a bill to enjoin the Secretary of War, and other officers, from carrying into execution certain acts of Congress, which it was asserted would annul and abolish the existing state government and establish another and different one in its place, called for a judgment upon a political question and presented no case within the jurisdiction of the Court. Mr. Justice Nelson, speaking for the Court, said (6 Wall. 77):

" That these matters, both as stated in the body of the bill, and, in the prayers for relief, call for the judgment of the court upon political questions, and, upon rights, not of persons or property, but of a political character, will hardly be denied. For the rights for the protection of which our authority is invoked, are the rights of sovereignty, of political jurisdiction, of government, of corporate existence as a State, with all its constitutional powers and privileges. No case of private rights or private property infringed, or in danger of actual or threatened infringement, is presented by the bill, in a judicial form, for the judgment of the court."

In *Cherokee Nation* v. *Georgia,* 5 Pet. 1, an injunction was sought to prevent certain acts of legislation from being carried into execution within the territory of the Cherokee Nation of Indians, the original jurisdiction of this Court being invoked on the ground that plaintiff was a foreign nation. It was asserted that the acts in ques-

tion, if executed, would have the effect of subverting the tribal government and subjecting the Indians to the jurisdiction of the State of Georgia. It was held that the Cherokee Nation could not be regarded as a foreign nation, within the meaning of the Judiciary Act, but Chief Justice Marshall, delivering the opinion for the majority, said, further (p. 20):

"That part of the bill which respects the land occupied by the Indians, and prays the aid of the court to protect their possession, may be more doubtful. The mere question of right might, perhaps, be decided by this court, in a proper case, with proper parties. But the court is asked to do more than decide on the title. The bill requires us to control the legislature of Georgia, and to restrain the exertion of its physical force. The propriety of such an interposition by the court may be well questioned; it savors too much of the exercise of political power, to be within the proper province of the judicial department." And Mr. Justice Thompson, with whom Mr. Justice Story concurred, in the course of an opinion, said (p. 75):

"It is only where the rights of persons or property are involved, and when such rights can be presented under some judicial form of proceedings, that courts of justice can interpose relief. This court can have no right to pronounce an abstract opinion upon the constitutionality of a state law. Such law must be brought into actual or threatened operation, upon rights properly falling under judicial cognizance, or a remedy is not to be had here." See also *Luther* v. *Borden,* 7 How. 1; *Mississippi* v. *Johnson,* 4 Wall. 475, 500; *Pacific Telephone Co.* v. *Oregon,* 223 U. S. 118; *Louisiana* v. *Texas,* 176 U. S. 1, 23; *Fairchild* v. *Hughes,* 258 U. S. 126.

It follows that in so far as the case depends upon the assertion of a right on the part of the State to sue in its own behalf we are without jurisdiction. In that aspect of the case we are called upon to adjudicate, not rights of

person or property, not rights of dominion over physical domain, not quasi-sovereign rights actually invaded or threatened, but abstract questions of political power, of sovereignty, of government. No rights of the State falling within the scope of the judicial power have been brought within the actual or threatened operation of the statute and this Court is as much without authority to pass abstract opinions upon the constitutionality of acts of Congress as it was held to be, in *Cherokee Nation* v. *Georgia, supra,* of state statutes. If an alleged attempt by congressional action to annul and abolish an existing state government " with all its constitutional powers and privileges," presents no justiciable issue, as was ruled in *Georgia* v. *Stanton, supra,* no reason can be suggested why it should be otherwise where the attempt goes no farther, as it is here alleged, than to propose to share with the State the field of state power.

We come next to consider whether the suit may be maintained by the State as the representative of its citizens. To this the answer is not doubtful. We need not go so far as to say that a State may never intervene by suit to protect its citizens against any form of enforcement of unconstitutional acts of Congress; but we are clear that the right to do so does not arise here. Ordinarily, at least, the only way in which a State may afford protection to its citizens in such cases is through the enforcement of its own criminal statutes, where that is appropriate, or by opening its courts to the injured persons for the maintenance of civil suits or actions. But the citizens of Massachusetts are also citizens of the United States. It cannot be conceded that a State, as *parens patriae,* may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof. While the State, under some circumstances, may sue in that capacity for the protection of its citizens (*Missouri* v. *Illinois,* 180 U. S. 208, 241), it is no

part of its duty or power to enforce their rights in respect of their relations with the Federal Government. In that field it is the United States, and not the State, which represents them as *parens patriae,* when such representation becomes appropriate; and to the former, and not to the latter, they must look for such protective measures as flow from that status.

Second. The attack upon the statute in the *Frothingham* case is, generally, the same, but this plaintiff alleges in addition that she is a taxpayer of the United States; and her contention, though not clear, seems to be that the effect of the appropriations complained of will be to increase the burden of future taxation and thereby take her property without due process of law. The right of a taxpayer to enjoin the execution of a federal appropriation act, on the ground that it is invalid and will result in taxation for illegal purposes, has never been passed upon by this Court. In cases where it was presented, the question has either been allowed to pass *sub silentio* or the determination of it expressly withheld. *Millard* v. *Roberts,* 202 U. S. 429, 438; *Wilson* v. *Shaw,* 204 U. S. 24, 31; *Bradfield* v. *Roberts,* 175 U. S. 291, 295. The case last cited came here from the Court of Appeals of the District of Columbia, and that court sustained the right of the plaintiff to sue by treating the case as one directed against the District of Columbia, and therefore subject to the rule frequently stated by this Court, that resident taxpayers may sue to enjoin an illegal use of the moneys of a municipal corporation. *Roberts* v. *Bradfield,* 12 App. D. C. 453, 459–460. The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate. It is upheld by a large number of state cases and is the rule of this Court. *Crampton* v. *Zabriskie,* 101 U. S. 601, 609. Nevertheless, there are decisions to the contrary. See,

for example, *Miller* v. *Grandy,* 13 Mich. 540, 550. The reasons which support the extension of the equitable remedy to a single taxpayer in such cases are based upon the peculiar relation of the corporate taxpayer to the corporation, which is not without some resemblance to that subsisting between stockholder and private corporation. IV Dillon Municipal Corporations, 5th ed., § 1580, *et seq.* But the relation of a taxpayer of the United States to the Federal Government is very different. His interest in the moneys of the Treasury—partly realized from taxation and partly from other sources—is shared with millions of others; is comparatively minute and indeterminable; and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity.

The administration of any statute, likely to produce additional taxation to be imposed upon a vast number of taxpayers, the extent of whose several liability is indefinite and constantly changing, is essentially a matter of public and not of individual concern. If one taxpayer may champion and litigate such a cause, then every other taxpayer may do the same, not only in respect of the statute here under review but also in respect of every other appropriation act and statute whose administration requires the outlay of public money, and whose validity may be questioned. The bare suggestion of such a result, with its attendant inconveniences, goes far to sustain the conclusion which we have reached, that a suit of this character cannot be maintained. It is of much significance that no precedent sustaining the right to maintain suits like this has been called to our attention, although, since the formation of the government, as an examination of the acts of Congress will disclose, a large number of statutes appropriating or involving the ex-

penditure of moneys for non-federal purposes have been enacted and carried into effect.

The functions of government under our system are apportioned. To the legislative department has been committed the duty of making laws; to the executive the duty of executing them; and to the judiciary the duty of interpreting and applying them in cases properly brought before the courts. The general rule is that neither department may invade the province of the other and neither may control, direct or restrain the action of the other. We are not now speaking of the merely ministerial duties of officials. *Gaines* v. *Thompson,* 7 Wall. 347. We have no power *per se* to review and annul acts of Congress on the ground that they are unconstitutional. That question may be considered only when the justification for some direct injury suffered or threatened, presenting a justiciable issue, is made to rest upon such an act. Then the power exercised is that of ascertaining and declaring the law applicable to the controversy. It amounts to little more than the negative power to disregard an unconstitutional enactment, which otherwise would stand in the way of the enforcement of a legal right. The party who invokes the power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally. If a case for preventive relief be presented the court enjoins, in effect, not the execution of the statute, but the acts of the official, the statute notwithstanding. Here the parties plaintiff have no such case. Looking through forms of words to the substance of their complaint, it is merely that officials of the executive department of the government are executing and will execute an act of Congress asserted to be unconstitutional; and this we are asked to prevent. To

do so would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly we do not possess.

*No. 24, Original, dismissed.*
*No. 962 affirmed.*