**WARM v CINCINNATI (city) et**

Ohio Appeals, 1st Dist, Hamilton Co

Decided July 26, 1937

George E. Fee, Cincinnati, and J. Louis Warm, Cincinnati, for appellant.

John D. Ellis, City Solicitor, Cincinnati, and Henry M. Bruestle, Cincinnati, for City of Cincinnati.

Harmon, Colston, Goldsmith & Hoadly, Cincinnati, and J. Louis Kohl, Cincinnati, for The New York Central Railroad Co.

## OPINION

By ROSS, PJ.

This case is here on appeal on questions of law and fact from the Common Pleas Court of Hamilton County.

Through this action it is sought to enjoin the performance of two contracts in which the city of Cincinnati is a contracting party, and the issuance and sale of bonds, provided for by an ordinance of the city, the proceeds of such sale to be allocated to the payment of the obligations of the city incident to such contracts.

The plaintiff, a taxpayer of the city of Cincinnati, brings this suit for and on behalf of the city.

The defendants are the city and The New York Central Railroad Company.

· Neither the state of Ohio nor any department of the Federal Government is made a party to this action.

In the petition it is alleged that on the 17th day of June, 1931, the city and the railroad entered into a written contract for the elimination of certain grade crossings in the city. This contract was executed under the provisions of the laws of the state of Ohio providing for such enterprises upon a basis of contribution of 35% of the cost for the city and 65% of the cost for the railroad. Thereafter, pursuant to appropriate legislation on the part of the city, on the 3rd day of September, 1936,

the city and the railroad company entered into a written agreement abrogating the contract of June 17, 1931, and releasing the railroad company from all liability thereunder to the city in consideration of the payment by the railroad company to the city of $100,000, and the conveyance of certain real estate acquired by the railroad company in pursuance of the terms of the former contract.

Upon the 8th of October, 1936, the city, the railroad company and the state of Ohio, through its Director of Highways, entered into a written contract by the terms of which it was agreed that the three contracting parties should cooperate in the elimination of the grade crossings, which had been the subject of previous legislation on the part of the city and the agreements previously entered into by the several parties in the latter contract.

It is alleged that this latter contract is illegal and void in a number of particulars being predicated upon §1228-1, GC, the Federal Emergency Relief Appropriation Act of 1935, and the rules and regulations adopted and approved by the Secretary of Agriculture of the United States, the Works Progress Administration of the United States, and the President of the United States.

It is further alleged that on the 28th day of October, 1936, the city, through an appropriate legislative act of its council, approved the plans for the improvement and contracted for the furnishing of title reports to land to be acquired for the project, and thereafter enacted legislation providing for the sale of $1,500 councilmanic bonds to defray part of the cost incident to proceeding with the enterprise, "in accordance with the spirit and purpose of the Federal Emergency Relief Appropriation Act of 1935."

As the provisions of the contract between the city and the railroad company of date of September 3, 1936, are merely incidental to the later contract of October 8, 1936, and cannot have any inherent and independent illegality attributable to them, a consideration of the later contract will present all the contentions of the plaintiff justifying, according to his claim, the injunction prayed for.

The plaintiff, in fact, in his brief asserts that only one contract, that of October 8, 1936, is involved.

It is unnecessary to state in detail the several terms of the contract. It is sufficient to state that it provides that it constitutes an agreement between the city,

the state, and the railroad company, whereby certain grade crossings of the railroad therein identified, shall be eliminated. It contains a number of "whereas" clauses, among which appears:

"Whereas, H. J. Res. 117 of the 74th Congress of the United States and §1228-1 GC have become effective providing all or any part of the cost of construction of grade projects, such as is herein contemplated, * * *."

The plans and specifications involved are identified and it is stated must receive the approval of the parties. Incidentally, it appears in the record that the city, state, and federal administrative officers have approved such plans and specifications. Matters involving wages and hours of labor also have been included in this full approval. There now remains nothing to do but proceed with the letting of the construction contracts. Certain items of work are to be let by bids to the state. It is stated:

"Sec. 4. Any work not specifically provided for in §3 shall be done by one of the parties hereto as may be mutually agreed upon from time to time during progress of the work, and as provided for by the rules and regulations of the Bureau of Public Roads, Department of Agriculture."

One objectionable feature is quoted at length:

"Sec. 7. It is understood that the project herein contemplated is to be financed from funds provided by the Federal Government and the city, and expended under federal regulations; that all plans, specifications, estimates of costs, awards of contracts, acceptance of work and procedure in general are subject at all times to all federal laws, rules and regulations, orders and approvals applying to it as a federal project; and the state will reimburse the city and company as provided herein, for only such items of work and expense and in such amounts and forms as are proper and eligible for payment from federal funds, and which have received approval by proper federal authorities, and the city and company shall render their billings in accordance with said rules and regulations as they have been issued and have been or may be supplemented or revised, and further agree to provide and furnish such itemized records of, and sub-

stantiating data for such costs as may be required by the state.

"It is the intention of the parties hereto to make the improvement contemplated herein under the provisions of §1228-1 GC and the Emergency Relief Appropriation Act of 1935 and the rules and regulations prescribed thereunder."

The state reserves the right to cancel the contract before construction contract is executed by the state.

Other important provisions of the agreement are:

"Sec. 9. The state has available for the construction of this improvement $635,000. To the extent of $635,000 the state will pay the entire construction cost, except water line changes, police and fire telephone lines and drainage work subject to the provisions of §§3, 6, 7 and 8 hereof. Should the total final cost of construction exceed $635,000, then the excess cost shall be borne by the city. The preliminary estimate of the total cost of construction is approximately $650,000. * * *

"The cost of property and property damages described in the preceding paragraph is estimated to be $325,000 and shall be borne 100% by the city subject to a supplementary agreement between the city and the company, a copy of which agreement is hereto attached and hereby approved by, but without obligation on the part of, the Director of Highways of the State of Ohio."

The act under which the original 35-65 per cent contract between the city and the railroad company was executed has been repealed.

Sec 1228-1, GC, authorizes "legislative authorities of any political subdivision" when authorized by the Director of Highways of the state and cooperating with the Department of Highways in projects under the act to follow the procedure authorized for the Director of Highways and that any municipal corporation may cooperate with the director in any such project. The act provides:

"The Director of Highways is authorized to accept any allotment of funds which may be made by the United States Government, or any department or agency thereof, as appropriated under the .'emergency relief appropriation act of 1935,' and any subsequent legislation either supplementing or amending such act * * * in accord-

ance with the rules and regulations issued thereunder, for or in connection with the separation of grades of a public highway and a railroad or railroads by the construction of a bridge, underpass, or highway or railroad relocation or for the alteration, relocation, reconstruction, change or repair of any bridge , or underpass carrying a public highway over or under a railroad, or for the protection of grade crossings. * * *."

Now in the preamble of the Federal Emergency Relief Appropriation Act of 1935, appears the following:

"That in order to provide relief, work relief and to increase employment by providing for useful projects, there is hereby appropriated, out of any money in the treasury not otherwise appropriated, to be used in the discretion and under the direction of the President, to be immediately available , and to remain available until June 30, 1937, the sum of $4,000,000,000."

And in the body of the resolution, it is stated:

"* * * this appropriation shall be available for the following classes of projects, and the amounts to be used for each class shall not, except as hereinafter provided, exceed the respective amounts stated, namely: (a) Highways, roads, streets, and · grade-crossing elimination, $800,000,000; * * *."

Other clauses of the contract involved will be noted in passing upon the plaintiff's claims of illegality.

The complaint of the plaintiff is based upon the claimed illegality of this state and federal legislation as a predicate for the contracts heretofore noted.

The plaintiff confines the questions presented within a narrow scope. He states in his brief:

"That issue is: Can the city of Cincinnati and the state of Ohio surrender to the administrator for the Federal Government charged with carrying out the provisions of the Federal Emergency Relief Appropriation Act of 1935, in this case the President of the United States, the right to predetermine the rates of wages, the hours of labor and the qualifications of the labor employed on this local project?"

It is thus asserted that the contracting parties, by the state legislation and the federal resolution, have ceded to the Presi-

dent of the United States the entire control over wages and hours of labor and that, as far as the state is concerned, this is a barter of the sovereignty of the state for federal financial aid.

It is conceded and has been repeatedly held that the state may not release any portion of its sovereign right and that any attempt to do so is void. But "even sovereigns may contract without derogating from their sovereignty" says Justice Cardozo in Steward Machine Co. v Davis ... U. S. ..., 81 L. Ed. 779, 57 Sup. Ct. 883, 895, and cites Perry v United States, 294 U. S. 330, 353, 79 J. Ed. 912, 55 Sup. Ct. 432, 95 A.L.R. 1335; 1 Oppenheim, International Law (4 Ed.), §§493, 494; Hall, International Law (8 Ed.), §107; 2 Hyde, International Law, §489. And even states, it is further noted. may make agreements with one another with the consent of Congress, and the conclusion is finished with the statement that: "We find no room for doubt that they may do the like with Congress if the essence of their statehood is maintained without impairment."

The state legislation attacked here amounts to no more than a contract or authority for a contract with Congress, in which there is no impairment of the "essence of statehood."

It is the contention of the plaintiff that the state has "ceded" its sovereign power to legislate upon the subject of wages and hours of labor. This implies the irrevocable separation of that particular power from the general authority of the sovereign state. States from time to time, by constitutional authority, cede to the Federal Government specific tracts of land. There is an irrevocable loss of jurisdiction in the state thereafter. Nothing in the legislation involved here suggests any such irrevocability.

In the regulations affecting wages and hours of labor fixed by the President there is no conflict with either the Constitution of Ohio or any act of the Legislature. It is difficult, therefore, to see where the authority conferred by §§4311 and 4314, GC, applies.

As far as the city is concerned, it can select any one it sees fit to fix, for the purpose of this separate and individual contract, matters involving wages and hours of labor. That this happens to be the same authority as that provided for by Congress is beside the point.

It is asserted that the credit of the city of Cincinnati is advanced for the benefit of the railroad company, contrary to the provisions of **Article VIII, §§5 and 6 of the Ohio Constitution.** Nothing in the contracts warrants such a conclusion.

Again the assertion is made that by mutually waiving damages to any property of the city and state involved in the enterprise, an unlawful transfer of public property has occurred. This contention also is without merit.

This plaintiff may not in this action collaterally attack the legality of a federal appropriation act, such as the Federal Emergency Relief Administration Resolution herein involved. Mass. v Mellon, 262 U. S. 447, 67 L. Ed. 1078, 43 Sup. Ct. 597. The resolution is not a taxing measure, but a conditional appropriation.

It would be easy to agree with much that counsel say in their elaborate and effective consideration of the federal resolution. Their industry is highly commendable. However, there is presented to this court by this appeal for its consideration a contract between the city of Cincinnati, the state of Ohio and the railroad company providing for a most worthy project—the elimination of a grade crossing. It is predicated upon a grant of federal funds to the state of Ohio, which that sovereignty has contracted to receive and use under certain conditions, which do not in any way cause the state of Ohio to irrevocably part with anything it may not regain immediately. In good conscience it should perform its part of the bargain, which, in effect, is that wages and hours of labor shall be controlled by the President of the United States, and that federal officers may make inspection of the work.

Can it be said such a contract is inherently illegal. With all due respect to counsel for the plaintiff, it would seem that they have gone far afield to so construe it.

That a state act may be illegal is beside the point, unless such act is directly necessary to sustain the powers exercised by the contracting parties to the contract attacked. Neither fact nor law shows such necessity to exist. Any discussion of the economic and political premises involved in the federal legislation considered, while undoubtedly interesting and inviting, has no place in this case except in so far as hereinbefore noted. To the extent that it is germane, it is not inimical to the interests of the city of Cincinnati.

It is unnecessary for this court to express

any opinion upon the merits of contentions made by the plaintiff attacking the legislation in a general way.

In that no invasion of the interests of the city of Cincinnati appears, warranting the intervention of injunction, the petition will be dismissed.

Petition dismissed.

MATTHEWS and HAMILTON, JJ, concur in the judgment.

## CONCURRING OPINION

By MATTHEWS, J.

The plaintiff as a taxpayer seeks to enjoin the defendants from carrying out the provisions of a contract, to which they and the state of Ohio are parties, providing for the elimination of certain grade crossings at certain highways.

It is conceded that the parties have authority to contract for the elimination of grade crossings, but it is contended that this particular contract contains provisions that are beyond the contractual powers of the state and municipality. The major portion of the money with which to pay the cost of these crossing eliminations is to be obtained from the United States Government. The provisions which are assailed are those incorporated into the contract to induce the grant of the money by it.

These provisions which are assailed consist of the Emergency Relief Appropriation Act, passed by Congress in 1936 and §§1228, 1228-1 and 17-4, GC, passed by the Ohio Legislature, which, if law, are a part of the contract.

It is also contended that the contract provides for the lending of credit of the state to the city and the credit of the city to The New York Central Railroad Company, contrary to §§5 and 6 of Article VIII of the Ohio Constitution, and is, therefore, null and void.

Judge Gorman, who heard this case in the Common Pleas Court, handed down an exhaustive opinion in which the statutes involved and the decisions bearing upon the issues were cited, pertinent parts quoted and commented upon. As this court reaches the same conclusion, I will only state briefly the reasons upon which I concur.

(1) This is not an attempt by the National Government to regulate the conduct of individuals within the territorial limits of a state without the consent of the state, as was the case in United States v Butler

et, Recrs., 297 U. S. 1, 80 L. Ed. 477, 56 Sup. Ct. 12, in which the Agricultural Adjustment Act was held to invade the reserved rights of the states, and, therefore, to be unconstitutional.

(2) The case presents a cooperative effort between the state and nation well within the principle of the cases of Steward Machine Co. v Davis, ... U. S. ..., 81 L. Ed. 779, 57 Sup. Ct. 883, and Carmichael v Southern Coal & Coke Co., ... U. S. ..., 81 L. Ed. 811, 825, 57 Sup. Ct. 868, in which the Social Security and Unemployment Insurance Acts of Congress and Alabama were held to be valid cooperative action of the nation and state.

(3) We are not presented with any problem relating to the raising of revenue. The Federal Emergency Relief Appropriation Act deals with public money already in the United States Treasury, subject to be spent at the will of Congress for any federal purpose. It is primarily an appropriation resolution and only incidentally, and in a minor sense, a law.

(4) The Federal Emergency Relief Appropriation Act finds its justification in Clause 1, §8 of Article I of the United States Constitution, giving to Congress power to levy and collect taxes to pay the debts and provide for the common defense and general welfare of the United States. The only part of that power that is in issue here is the power to spend.

In United States v Butler, supra, the court held that this provision of the Constitution was a grant of a separate and distinct substantive power to tax and spend for the general welfare of the United States. The majority of the court in that case held that the act was not a true taxing measure for public purposes, but was an expropriation of money of one class for the benefit of another, contrary to the due process clause of the Fifth Amendment; and, furthermore, assuming the validity of the assessment as a tax, the purpose for which it was to be spent was not the general welfare of the United States.

That unemployment so widespread as to affect every community of the United States is a matter affecting the general welfare of the United States seems to be manifest. The spending of money to relieve such unemployment, caused in part, perhaps, by the Federal Government itself, is an exercise of the power to spend tax money for the general welfare of the United States, within the meaning of §8 of Article I. Certainly, the court would not

be justified in saying it was not. In Steward Machine Co. v Davis, supra, it is said:

"It is too late today for the argument to be heard with tolerance that in a crisis so extreme the use of the moneys of the nation to relieve the unemployed and their dependents is a use for any purpose narrower than the promotion of the general welfare."

(5) The Federal Emergency Relief Appropriation Act sets forth the purpose for which the money is to be spent. The legislative function is complete. It states the standard or "intelligible principle" to which the executive department must conform and leaves to it only the power to fill in the administrative details. There is no abdication of legislative power in favor of the executive, as was the case in Schechter Poultry Co. v United States, 295 U. S. 495, 79 L. Ed. 1570, 55 Sup. Ct. 837.

(6) The Ohio Acts (§§17-4, 1228 and 1228-1, GC) are enabling acts passed to authorize the state officials to enter into this cooperative effort to rectify a condition that concerned Ohio, because it was within its borders, and concerned the general welfare of the United States because it spread beyond the borders of Ohio to the entire width and length of the nation. It was a public governmental purpose as to each. Each owed a duty to do what was within its power to relieve the distress resulting from unemployment.

In entering into this cooperative enterprise to relieve unemployment the two governments occupied the position of sovereign states. They pledged their good faith as sovereign nations do in international affairs. Neither by express stipulation nor by implication did either surrender any of its sovereignty.

Giving to the administrative officers of the United States the right to fix wages, hours of service and working conditions upon a construction, paid for with money furnished by the United States, is no more a surrender of sovereignty than a state employing a private independent contractor to accomplish a stated result, without legislating as to the wages and hours of service of his employees. In the absence of legislation, the contractor could fix the wages and hours of service. The state could take this power away by legislating on the subject, or, if legislation existed at the time the contract was made, it would become a part of the contract. But so would that other law that the state cannot irrevocably barter away its police power, which includes the power to fix wages and hours of service when necessary for the public welfare. This power could be exercised by repealing or amending laws in force when contracts had been made. The sovereign power of the state to legislate on the subject of safety, health, morals, prosperity and general welfare would be no more limited in the one case than in the other. Exercising the power in this case might have the effect of causing the United States Government to refuse to contribute or continue to contribute to the enterprise, but it would not affect the validity of the legislation.

(7) As I view the situation, it is another instance of the familiar "Grants in Aid" with condition imposed. They have been made almost from the founding of the nation.

(8) I am also of the opinion that a taxpayer has not a sufficient interest in tax money in the United States Treasury to serve as a predicate for an action to enjoin its expenditure. As the taxpayer has no title his action presents a moot issue. This was decided in Massachusetts v Mellon, 262 U. S. 447, 67 L. Ed. 1078, 43 Sup. Ct. 597. No legislature of a state can affect the title to the public money in the United States Treasury by any form of legislation.

This, however, would not prevent a taxpayer exercising his statutory right to enjoin the city from exceeding the authority conferred upon it by the state Constitution and legislative enactments. And it is clear that no authority is conferred upon a municipality to enter into an illegal transaction, contractual or otherwise. Incorporating a void provision in a contract falls far short of rendering unlawful all the provisions of a contract. The right to injunctive relief could not extend to the lawful provisions of the contract. By this observation, I do not mean to imply that there is any void provision in the contract under consideration.

(9) As the city and state have authority to contract for the elimination of grade crossings, if certain provisions of the contract should be beyond their power (which, as already stated, I do not intimate), that would not render the entire contract illegal. 19 Ruling Case Law, 1065, §353; 6 Ruling Case Law, 814, §214; 9 Ohio Jurisprudence 389, §166. Only the ultra vires provisions would fall. That would not justify enjoining the performance of the intra vires provisions of the contract.

The power of the city and the state is a

matter of law of which all must take cognizance Whether a private person contracting with a state, or political subdivision of it, could refuse to perform, because a part of the contract was ultra vires, we do not consider. No such question is presented. If we assume that this arrangement between the state and nation occupies the same juristic position as a contract between private individuals, it would be sufficient to say that the person injuriously affected by the collapse of the ultra vires provisions is not ·complaining. However, we do not believe. that when two sovereigns join to perform a common governmental function, such a concord can be measured by the principles of private contract. They pledge their good faith. The language is not appropriate for the expression of a legal duty. The obligation thereby created is imperfect. There is no superior authority to which appeal may be made for assistance in the enforcement of the obligation, as may be done by private persons contracting with one another.

For these reasons I concur in the judgment denying the injunction.

### CONCURRING OPINION

By HAMILTON, J.

I am of the opinion that the cases of Carmichael v Southern Coal & Coke Co., ... U. S. ..., 81 L. Ed. 811, 825, 57 S. Ct. 868, and Steward Machine Co. v Davis, ... U. S. ..., 81 L. Ed. 779, 57 S. Ct. 883, in principle sustain the contract in question.

The appellant's counsel evidently confuse sovereign power with the manner of exercising sovereign power. The state exercised its sovereign power by entering into the contract. It is urged that it surrendered sovereign power to the Federal Government by entering into the contract which gave the Federal Government control over the hours of service, wages, and supervision. This does not seem to me to be other than control over details as a part of the consideration for the large grant of money by the Federal Government to aid the state and city in a large, beneficial public improvement, the very antithesis of a surrender of power.

I concur with my associates in the judgment, denying the injunction and dismissing the petition.