

# THE ATTORNEY GENERAL
## OF TEXAS

October 18, 1965

**WAGGONER CARR**
**ATTORNEY GENERAL**

Honorable John Winters          Opinion No. C-530
Commissioner
State Dept. of Public Welfare   Re:   Various questions concern-
Austin, Texas                         ing the State Department of
                                      Public Welfare's plan for
                                      implementing the State of
                                      Texas projects authorized
                                      by Senate Bill No. 163, Acts
                                      of the 59th Legislature,
                                      Regular Session, in compli-
                                      ance with the agreements with
                                      the Department of Health,
                                      Education and Welfare as pro-
                                      vided in Title V of Public
Dear Mr. Winters:                     Law 88-452.

Your recent opinion request reads, in part, as follows:

"The Honorable Robert S. Calvert, Comp-
troller of Public Accounts, has raised some
questions in relation to the validity of some
of the aspects of the programs authorized by
Senate Bill No. 163, Acts of the 59th Legis-
lature, Regular Session, 1965, in addition to
those answered in your Opinion No. C-464 dated
July 19, 1965.

"   . . .

"Questions in addition to those answered
in Opinion C-464 are being raised in reference
to the Department's plan for implementing
the State of Texas projects authorized by
Senate Bill No. 163 in compliance with the
agreements with the Department of Health,
Education, and Welfare as provided for in
Title V of Public Law 88-452.

"Pursuant to the authority contained in
the foregoing Federal Laws and State Consti-
tution and Laws, the State Department of Pub-
lic Welfare has drafted tenative projects

for the purpose of assisting needy persons to secure and retain employment or to attain and retain capability for self-support or personal independence. The Department has entered into tenative agreements with the Department of Health, Education, and Welfare for the purpose of implementing these projects. The costs of such projects will be borne by the Government of the United States and all funds will be made available to the State Department of Public Welfare through the Department of Health, Education, and Welfare.

"Although the various projects which are in the formative stage will have variable functions and purposes, the basic questions which are being raised at this time will relate to all of them. For the purpose of illustrating the general principles involved in the tenative projects, we are using the project which would involve an agreement between the State Department of Public Welfare and the Board for Texas State Hospitals and Special Schools.

"The training project would be set up for purpose of preparing trainees who are either recipients of assistance for dependent children or are persons who are not currently recipients of Aid to Families with Dependent Children, but who have dependent children in the family. Under this training project, the State Department of Public Welfare would have the sole responsibility for selecting the trainees and would have qualified personnel of the State Department of Public Welfare in supervisory roles.

"The trainees, if recipients of Aid to Families with Dependent Children, would continue to receive their assistance grants. In addition thereto they would be paid sums sufficient to make up the difference between the amount of their assistance grants and the amount of their needs.

"This supplemental amount would be determined by the State Department of Public Welfare in compliance with rules and regulations promulgated by the Department, in compliance

with the approved project, and in compliance with the agreement with the Board for Texas State Hospitals and Special Schools.  This supplemental amount would be paid exclusively out of the 'Economic Opportunity Fund - Welfare' which is all Federal funds.

"In the case of the non-recipient, the entire amount to meet the needs of the family would be paid out of the 'Economic Opportunity Fund - Welfare'.  All payments out of the 'Economic Opportunity Fund - Welfare' for trainees on this project would be contingent upon the person being responsible for the dependent children.  The training project is designed for the purpose of assisting the parent or other relative responsible for the dependent children in becoming self-sustaining through training.  This is the basic principle of Title V of the Economic Opportunity Act.

"Section 502 of Title V, Public Law 88-452 places some limitations upon the projects.  These projects are subject to the limitations contained in Section 409(a) (1) to (6), inclusive, of such Act (42 U.S.C. 609(a) (1)-(6) ).

"Section 409 (a) provides for the formulation and approval of a State Plan if such Plan includes:

"'(1)  provisions which, in the judgment of the Secretary, provide reasonable assurance that --

"'  . . .

"'(F) any such relative will, with respect to the work so performed, be covered under the State workmen's compensation law or be provided comparable protection; and '

"Under rules and regulations promulgated by the Secretary and pursuant to this provision of the law, the Department may provide 'comparable protection' in the form of insurance or a pooled fund.  The Department prefers to provide this protection in the form of insurance from a

private company for the protection of the trainee who might become ill or injured on the project.

"In addition to the personnel of the State Department of Public Welfare required as stated above, the Board for Texas State Hospitals and Special Schools would provide the materials required in training and would use its personnel for the actual supervision of the trainees on the project. It is anticipated that the project would be set up initially for a period of one year and that the period of training for the individual trainee would range from six months to a year depending upon the type of training and the requirements of the individual.

"It is also anticipated that in addition to agreements with other State Agencies for the implementation of projects, the Department may also enter into agreements with private concerns or individuals, for the purpose of training these trainees.

"Our basic questions are:

"1.   Can the State Department of Public Welfare enter into a contract with a private insurance company for the protection of the trainees on these projects and pay for insurance premiums out of these funds?

or

Can the Department provide this protection through a 'pooled fund'?

"2.   Can the State Department of Public Welfare pay the parent or other person responsible for the dependent child or children in a family, in addition to the public assistance grant or in lieu of the public assistance grant, for the purpose of meeting the needs of the family while the individual is being trained?

"3.   Can the State Department of Public Welfare pay the Board for Texas State Hospitals and Special Schools, any other

State Agency, or any private concern, or
individual for the purpose of training
the parent or other person responsible
for the dependent child or children?

"4. Can we do all other things necessary to
carry out the provisions of this Act?"

These Federal funds were deposited in the State Treasury, hence
have become State funds. The State of Texas and its agencies are
immune from tort liability in the absence of a preexisting statute
authorizing same. Brooks v. State, 68 S.W.2d 534 (Tex.Civ.App.
1934, error ref.); Matkins v. State, 123 S.W.2d 953 (Tex.Civ.App.
1939, error dism., Judg. correct); State v. Morgan, 140 Tex. 620,
170 S.W.2d 652 (1943); Fonseca v. State, 297 S.W.2d 199 (Tex.Civ.
App. 1957); Art. III, Sec. 44 of the Constitution of Texas; 52 Tex.
Jur.2d 750, State of Texas, Sec. 40; 27 Tex. Law Rev. 349. Further-
more, Sections 50 and 51 of Article III of the Constitution of Texas,
prohibiting the State from lending its credit or granting public
money or thing of value in aid of or to any individual, association,
or corporation, the State and its agencies are held not authorized
to carry workmen's compensation insurance in performing any function
of government or administering a portion of government. 52 Tex.Jur.
2d 752-754, State of Texas, Secs. 41 and 42. Consequently, Section
59 of Article III of the Constitution of Texas had to be adopted in
order for the Legislature to have the authority to enact workmen's
compensation laws. See Brooks v. State, supra. This section of
Article III now authorizes the Legislature to pass such laws for
"State employees" as in the Legislature's "judgment is necessary
or required." Pursuant thereto, the Legislature has only adopted
such legislation for University of Texas employees (Art. 8309d,
V.C.S.), Texas A & M University employees (Art. 8309b), Texas
Technological College employees (Art. 8309f), and Texas Highway
Department employees (Art. 6674s).

However, it is our opinion that your department is not pro-
hibited from using these Federal funds to provide for protective
insurance to cover the trainees pursuant to contract with a
private insurer. We heretofore observed in Attorney General's
Opinion C-464, dated July 19, 1965, and addressed to you, at
page 9 as follows:

"The funds for implementation of the planned
project or program, presently deposited in the
Treasury of the State of Texas in a special fund
known as the 'Economic Opportunity Fund - Welfare',
consist entirely of Federal funds paid to the
State Department of Public Welfare for carrying
out the planned projects or programs."

We think the conclusion is inescapable that under the law these Federal funds are impressed with a trust and that the State of Texas has enacted an adopting State statute by which it is authorized to carry out the purposes of this public trust as provided and required by the Federal statute, the Economic Opportunity Act.

The Legislature, recognizing the trust nature of the Federal funds, proceeded to enact House Bill No. 12, Acts of the 59th Legislature, Regular Session, 1965 (the General Appropriations Act for the biennium beginning September 1, 1965 and ending August 31, 1967), which appropriates the Federal funds and stipulates the conditions under which such funds may be expended. Reference is made to Article V, Section 27 of said General Appropriations Act which provides as follows:

"Sec. 27. FEDERAL FUNDS APPROPRIATED FOR USE. Any funds received by the agencies of the State named in this Act from the United States Government are hereby appropriated to such agencies for the purposes for which the Federal grant, allocation, aid, or payment was made, subject to the provisions of this Act. Within thirty (30) days after the receipt of any such Federal grants, allocations, aid or payments, the amounts thereof and the purposes for which they were made shall be reported to the Governor and the Legislative Budget Board." (Underscoring added for emphasis.)

It appears clearly that the United States Government has intended to impose upon the states who accept the Federal funds as transferee of the funds equitable duties (or conditions) to deal with same for the benefit of the trainees, and the fact that no formal or technical language was used, such as "trust" or "trustee", is not controlling. The test of whether a trust was created is whether the Federal government, as settlor, manifested an intention to create the kind of relationship which to lawyers is known as a trust. Scott on Trusts, Vol. 1, Section 24, page 147; Bogert, Trusts and Trustees, Vol. 1, Section 45, pages 293, 294; Restatement, Trusts, Vol. 1, Chapter 1, Section 2, page 6.

A fundamental requisite of a trust is the separation of the legal estate from the equitable estate and the beneficial enjoyment. 54 Am.Jur., Trusts, Section 35, at pages 46 and 47; 10 Am.Jur., Charities, Section 4, at page 587.

We are of the opinion that the Federal government, as settlor, intended to create a trust which would be for a public purpose.

It is recognized generally that the state or sovereign, as well as public officers, may be a trustee with respect to matters falling within its functions. 90 C.J.S. 133, Trusts, Sec. 204; 81 C.J.S. 1189, 1191, States, Sec. 154.

In 81 C.J.S. 1146, States, Sec. 132, the general rule is recognized that,

> "With respect to the handling of public funds, the legislature is in a position similar to that of a trustee, and the rule of fiduciary law that a trustee shall not be allowed to advantage himself in dealing with trust funds is apposite."

The caption of S.B. No. 163 is clear in " . . . authorizing the State Department of Public Welfare to accept and expend any Federal moneys allocated to the said Department for any projects or programs established to carry out the purposes of this Act and for administrative expenses and/or any other expenses incident to the administration of said projects or programs . . . ."

Section 2 of the Act provides that " . . . such funds shall be subject to withdrawals upon authorization of the Commissioner of Public Welfare . . . " Section 3 also repeats this provision.

Under the statute no implementing state funds whatever is required, and the Federal funds are trust funds which are being held in custody subject to withdrawal only for the purposes and administration of the Federal statute.

We have heretofore recognized and held that funds of similar character are to be impressed with a trust when deposited in a special account with the State Treasurer as custodian, and so held and expended by state officials. See Attorney General Opinions WW-565, WW-600, and W-1321, and authorities cited.

The State Department of Public Welfare has been delegated - in broad and general terms - the task of shaping the specifics of the job training programs contemplated under Title V of the Economic Opportunity Act of 1964. In this regard, Section 1 of Senate Bill 163, full citation supra, provides in part:

> "Section 6-A. (a) <u>The State Department of Public Welfare is hereby designated as the State Agency to cooperate with the Federal Government in the administration of the provisions of Title V of the 'Economic Opportunity Act of 1964' and of the provisions of such other applicable titles of</u>

the 'Economic Opportunity Act of 1964' as are now
provided or as may be added thereto from time to
time in the event no other State Agency is by law
designated to cooperate with the Federal Government
in the administration of the provisions of such
title or titles as may be added to said Act, and
the Department is directed to enact and promulgate
such rules and regulations as may be necessary to
effect the cooperation as herein outlined and
designated.

"The State Department of Public Welfare is
hereby authorized and directed to take all
necessary and proper action to administer the
programs contemplated in Title V and such other
applicable titles of said Act and to cooperate
with the proper Departments of the Federal
Government and with all other Departments of
the state and local governments in the enforcement
and administration of such provisions of the
'Economic Opportunity Act of 1964' and any
amendments thereto and/or any other related
Federal Acts enacted for the purpose of carrying
out the provisions of the 'Economic Opportunity
Act of 1964' and any amendments thereto, and
the rules and regulations issued thereto and in
compliance therewith, in the manner prescribed
in this Act or as otherwise provided by law."
(Emphasis added.)

Title V of the Economic Opportunity Act of 1964 authorizes
the federal government to provide the state with funds for the
job training of ". . . persons who are unable to care for
themselves or their families . . ." at Section 501.

Insurance protection is clearly required by Section 502,
Title V of the Economic Opportunity Act as a condition precedent
to federal aid by clear reference therein to Sections 409 (a) (1)
to (6) inclusive of the Social Security Act /42 U.S.C. 609 (a)
(1) to (6) inclusive; see subsection (1) (F)_7.

There can be no doubt that the legislature, through the
means of legislative adoption by reference throughout Section
6-A of Senate Bill 163, has conferred state authority to so
administer the Federal funds pursuant to Title V of the Economic
Opportunity Act. Bass v. Albright, 59 S.W.2d 891 (Tex.Civ.App.
1933, error ref.), and its holding that,

"As a method of legislation in order to avoid unnecessary verbiage express reference may be made to laws for the purpose of adopting the provisions of the law referred to . . . ."

Thus, in further answer to your first question, you are advised that the State Department of Public Welfare can enter into a contract with a private insurance company for the protection of the trainees on these projects and pay for insurance premiums out of these federal funds. You can not provide insurance protection through a pooled fund because there is no statutory framework for the administration of such a fund.

In answer to your second and third questions, you are advised that such questions are answered in the affirmative. With reference to your all-inclusive fourth question, we do not have sufficient information to enable us to answer that question under all of the possible situations inherent in it.

Senate Bill 163 and Public Law 88-452, "The Economic Opportunity Act of 1964", must be read together in order to derive the substantive meaning and operative effect thereof, and qualified, where applicable, by reference to the Texas Constitution, particularly Section 51, Article III thereof, which provides in part:

"The Legislature shall have no power to make any grant or authorize the making of any grant of public moneys to any individual, association of individuals, municipal or other corporations whatsoever, . . ."

However, the courts have not applied this constitutional provision strictly, but on the other hand, they have held it inapplicable where a governmental or public purpose for the expenditure exists. State v. City of Austin, 160 Tex. 348, 331 S.W.2d 737 (1960); Brown v. Galveston, 97 Tex. 1, 75 S.W. 488 (1903); 52 Tex.Jur.2d 754-757, State of Texas, Sec. 43.

Therefore, in each situation arising, the test to be applied is that of governmental or public purpose. Although the statement of the test is simple enough, its application is made difficult by the apparent inability of our courts to lay down any definite rule applicable to all situations. For example, in Bland v. City of Taylor, 37 S.W.2d 291 (Tex.Civ. App. 1931), aff. 123 Tex. 39, 67 S.W.2d 1033, the Court said:

"What constitutes a public purpose as
contradistinguished from a private purpose
for which public funds may be applied has
been repeatedly before the courts of
practically every state in the Union and
the Supreme Court of the United States but
no court has undertaken to lay down with
minute detail an inexorable rule that
would distinguish one from the other.
Obviously no such rule could be laid down
. . ."

Other authorities have observed:

"Frequently an object presents a double
aspect in that it may in some respect result
in conferring a benefit upon the public and
in other respects it may result in conferring
a benefit upon or in paying money to private
individuals. . . . It is plain that an expendi
ture is not necessarily barred, because, indi-
viduals as such may profit, nor is it necessarily
valid because of incidental benefit to the
public . . ." Allydon Realty Corp. v. Holyoke
Housing Authority, 23 N. E. 2d 665 (Mass.Sup.Ct.
1939); Attorney General Opinion C-342 (1964);
and Texas cases therein cited.

Thus, it is to be seen that generally the cases tend to
classify expenditures as for public or private purposes accord-
ing to what the courts construe to be their consequences and
effects. See 81 C.J.S. 1147, et seq., States, Sec. 133. In
Attorney General's Opinion V-1067 (1950), this office said
in part:

"In determining whether an expenditure of
public moneys constitutes a gift or a grant of
public moneys, 'the primary question is whether
the funds are used for a "public" or a "private"
purpose. The benefits of the State from an ex-
penditure for a "public purpose" is in the nature
of consideration and the funds expended are there-
fore not a gift even though private persons are
benefited therefrom.'"

The Attorney General, in Opinion WW-1229, had occasion to
consider the question of determination of "public purpose" ex-
penditures involving the state vocational rehabilitation program,
and what was there said is equally applicable to the situation
presented here:

> "In deciding what is a public purpose,
> as opposed to a private purpose, it has been
> held that a contribution by a state, or any
> subdivision thereof, by way of taxation or
> any public moneys, to retirement or disability
> funds or programs is not a donation for a
> 'private purpose.' Bedford v. White, 106 Colo.
> 439, 106 P.2d 469 (1940). The determination of
> what constitutes a 'public purpose' for which a
> state may expend moneys has been held to be
> primarily a legislative function subject to
> review by the courts when abused, and the de-
> termination of the legislative body of the
> matter has been held to be not subject to be
> reversed except in instances where such deter-
> mination is palpably and manifestly arbitrary
> and incorrect. State ex rel. McClure v.
> Hagerman, 155 Ohio St. 320, 98 N.E.2d 835
> (1951). The Legislature of this State has
> clearly indicated by its adoption of this
> program that it is within the realm of the
> 'public purpose' and it is hard to imagine
> that the determination that the complete
> vocational rehabilitation program as outlined
> is a 'public purpose' would be held by the
> courts to be 'manifestly incorrect and
> arbitrary.'"

In testing the validity of the expenditure, the courts will look to the character of the use for which the money is expended, not who receives it. 81 C.J.S. 1148, States, Sec. 133. Conse-quently, the parents as well as the child may receive the money, as the public character of the use may consider the entire family needs. Mercedes County v. Dept. of Social Welfare, 307 P.2d 46 (Col.Dist.Ct. of App. 1957).

The public purpose of such expenditures as are authorized by the Economic Opportunity Act of 1964, which is aimed at poverty from unemployment, has been judicially recognized by the Supreme Court of Texas in Friedman v. American Surety Co. of New York, 137 Tex. 138, 151 S.W.2d 570 (1941):

> " . . . Unemployment always has had, and
> always will have, a very profound influence upon
> the public welfare. The evils which attend it
> permeate every part of our social, economic, and
> political structure. Unemployment bears in its
> wake vagrancy, crimes, reduction in marriage,
> deterioration in health, and destruction of family

life. It not only impairs the health of the
unemployed, but impairs the health of their
dependents. It lessens and often destroys,
patriotic impulses. It retards the education
of the youth of the land. It fosters and produces
other evils too numerous to mention. This Act
was intended to lessen those evils. To our minds
no court ought to say that such a purpose is out-
side of the administration of Government."
(Emphasis added.)

We have also heretofore upheld the constitutionality of
job training of parents of dependent children in Attorney General
Opinion C-464 (1965).

It is our opinion that the specific programs and expendi-
tures of Federal funds inquired about do not violate Section
51 of Art. III of the Constitution of Texas.

The Supreme Court of Texas, in State v. City of Austin,
160 Tex. 348, 331 S.W.2d 737 (1960) said in part, in referring
to Section 51, Art. III of our Constitution:

"... The purpose of this section ...
of the Constitution is to prevent the appli-
cation of public funds to private purposes .
... See Byrd v. City of Dallas, 118 Tex. 28,
6 S.W.2d 738."

When Texas adopted by statute the Federal program, including
its standards and conditions, to carry out the public purpose of
carrying out unemployment policies nation-wide in scope, it
did what has already been upheld in other states as legally valid
and within the powers of state government for public or govern-
mental purposes. 81 C.J.S. 896, States, Sec. 7; Massachusetts
v. Mellon, 43 S.Ct. 597, 262 U.S. 447 (1923); Warm v. City of
Cincinatti, 1 Ohio Supp. 273, Aff. 11 N.E.2d 281 (1937); Moore
v. Ward, (Ky.), 377 S.W.2d 881 (1964); Starr v. Nashville
Housing Authority, D.C. Tenn., 145 F. Supp. 498, Aff. 354 U.S.
916 (1957).


## S U M M A R Y

The State Department of Public Welfare may enter
into a contract with a private insurance company for
the protection of the trainees on the projects and
pay for insurance premiums out of the funds appro-
priated under the Economic Opportunity Act of 1964.

It may pay the parent or other person responsible for the dependent child or children in a family, in addition to the public assistance grant or in lieu of the public assistance grant, for the purpose of meeting the needs of the family while the individual is being trained. It may also pay the Board for Texas State Hospitals and Special Schools, any other State Agency, or any private concern, or individual for the purpose of training the parent or other person responsible for the dependent child or children.

Yours very truly,

WAGGONER CARR
Attorney General of Texas

By: _Kerns B. Taylor_
Kerns B. Taylor
Assistant

KBT/fb

APPROVED:

OPINION COMMITTEE
W. V. Geppert, Chairman
Bob Flowers
Roger Tyler
J. C. Davis
Phillip Crawford
Marietta Payne
Milton Richardson
Arthur Sandlin
H. Grady Chandler

APPROVED FOR THE ATTORNEY GENERAL BY:
T. B. Wright