Justice Scalia,
with whom Justice Thomas joins, concurring in the judgment.
Today’s opinion is, in one significant respect, entirely consistent with our previous cases addressing taxpayer standing to raise Establishment Clause challenges to government expenditures. Unfortunately, the consistency lies in the creation of utterly meaningless distinctions which separate the case at hand from the precedents that have come out differently, but which cannot possibly be (in any sane world) the reason it comes out differently. If this Court is to decide cases by rule of law rather than show of hands, we must surrender to logic and choose sides: Either Flast v. Cohen, 392 U. S. 83 (1968), should be applied to (at a minimum) all challenges to the governmental expenditure of general tax revenues in a manner alleged to violate a constitutional provision specifically limiting the taxing and spending power, or Flast should be repudiated. For me, the choice is easy. Flast is wholly irreconcilable with the Article III restrictions on federal-court jurisdiction that this Court has repeatedly confirmed are embodied in the doctrine of standing.
I
A
There is a simple reason why our taxpayer-standing cases involving Establishment Clause challenges to government *619 expenditures are notoriously inconsistent: We have inconsistently described the first element of the “irreducible constitutional minimum of standing,” which minimum consists of (1) a “concrete and particularized” “ ‘injury in fact’ ” that is (2) fairly traceable to the defendant’s alleged unlawful conduct and (3) likely to be redressed by a favorable decision. See Lujan v. Defenders of Wildlife, 504 U. S. 555, 560-561 (1992). We have alternately relied on two entirely distinct conceptions of injury in fact, which for convenience I will call “Wallet Injury” and “Psychic Injury.”
Wallet Injury is the type of concrete and particularized injury one would expect to be asserted in a taxpayer suit, namely, a claim that the plaintiff’s tax liability is higher than it would be, but for the allegedly unlawful government action. The stumbling block for suits challenging government expenditures based on this conventional type of injury is quite predictable. The plaintiff cannot satisfy the traceability and redressability prongs of standing. It is uncertain what the plaintiff’s tax bill would have been had the allegedly forbidden expenditure not been made, and it is even more speculative whether the government will, in response to an adverse court decision, lower taxes rather than spend the funds in some other manner.
Psychic Injury, on the other hand, has nothing to do with the plaintiff’s tax liability. Instead, the injury consists of the taxpayer’s mental displeasure that money extracted from him is being spent in an unlawful manner. This shift in focus eliminates traceability and redressability problems. Psychic Injury is directly traceable to the improper use of taxpayer funds, and it is redressed when the improper use is enjoined, regardless of whether that injunction affects the taxpayer’s purse. Flast and the cases following its teaching have invoked a peculiarly restricted version of Psychic Injury, permitting taxpayer displeasure over unconstitutional spending to support standing only if the constitutional provision allegedly violated is a specific limitation on the taxing and spending power. Restricted or not, this conceptualizing *620 of injury in fact in purely mental terms conflicts squarely with the familiar proposition that a plaintiff lacks a concrete and particularized injury when his only complaint is the generalized grievance that the law is being violated. As we reaffirmed unanimously just this Term: “ ‘We have consistently held that a plaintiff raising only a generally available grievance about government — claiming only harm to his and every citizen’s interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large — does not state an Article III case or controversy.’” Lance v. Coffman, 549 U. S. 437, 439 (2007) (per curiam) (quoting Lujan, supra, at 573-574).
As the following review of our cases demonstrates, we initially denied taxpayer standing based on Wallet Injury, but then found standing in some later cases based on the limited version of Psychic Injury described above. The basic logical flaw in our cases is thus twofold: We have never explained why Psychic Injury was insufficient in the cases in which standing was denied, and we have never explained why Psychic Injury, however limited, is cognizable under Article III.
B
1
Two pre-Flast cases are of critical importance. In Frothingham v. Mellon, decided with Massachusetts v. Mellon, 262 U. S. 447 (1923), the taxpayer challenged the constitutionality of the Maternity Act of 1921, alleging in part that the federal funding provided by the Act was not authorized by any provision of the Constitution. See id., at 476-477 (argument for Frothingham), 479-480 (opinion of the Court). The Court held that the taxpayer lacked standing. After emphasizing that “the effect upon future taxation ... of any payment out of [Treasury] funds” was “remote, fluctuating and uncertain,” id., at 487, the Court concluded that “[t]he party who invokes the power [of judicial review] must be able *621 to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally,” id., at 488. The Court was thus describing the traceability and redressability problems with Wallet Injury, and rejecting Psychic Injury as a generalized grievance rather than concrete and particularized harm.
The second significant pre-Flast case is Doremus v. Board of Ed. of Hawthorne, 342 U. S. 429 (1952). There the taxpayers challenged under the Establishment Clause a state law requiring public-school teachers to read the Bible at the beginning of each schoolday. Id., at 430, 433.[1] Relying extensively on Frothingham, the Court denied standing. After first emphasizing that there was no allegation that the Bible reading increased the plaintiffs’ taxes or the cost of running the schools, 342 U. S., at 433, and then reaffirming that taxpayers must allege more than an indefinite injury suffered in common with people generally, id., at 434, the Court concluded that the “grievance which [the plaintiffs] sought to litigate here is not a direct dollars-and-cents injury but is a religious difference,” ibid. In addition to reiterating Frothingham’s description of the unavoidable obstacles to recovery under a taxpayer theory of Wallet Injury, Doremus rejected Psychic Injury in unmistakable terms. The opinion’s deprecation of a mere “religious difference,” in contrast to a real “dollars-and-cents injury,” can only be understood as a flat denial of standing supported only by taxpayer disapproval of the unconstitutional use of tax funds. If the *622 Court had thought that Psychic Injury was a permissible basis for standing, it should have sufficed (as the dissenting Justices in Doremus suggested, see 342 U. S., at 435 (opinion of Douglas, J.)) that public employees were being paid in part to violate the Establishment Clause.
2
Sixteen years after Doremus, the Court took a pivotal turn. In Flast v. Cohen, 392 U. S. 83 (1968), taxpayers challenged the Elementary and Secondary Education Act of 1965, alleging that funds expended pursuant to the Act were being used to support parochial schools. Id., at 85-87. They argued that either the Act itself proscribed such expenditures or that the Act violated the Establishment Clause. Id., at 87, 90. The Court held that the taxpayers had standing. Purportedly in order to determine whether taxpayers have the “personal stake and interest” necessary to satisfy Article III, a two-pronged nexus test was invented. Id., at 101-102.
The first prong required the taxpayer to “establish a logical link between [taxpayer] status and the type of legislative enactment.” Id., at 102. The Court described what that meant as follows:
“[A] taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, §8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. This requirement is consistent with the limitation imposed upon state-taxpayer standing in federal courts in Doremus . . . .” Ibid.
The second prong required the taxpayer to “establish a nexus between [taxpayer] status and the precise nature of the constitutional infringement alleged.” Ibid. The Court elaborated that this required “the taxpayer [to] show that *623 the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, §8.” Id., at 102-103. The Court held that the Establishment Clause was the type of specific limitation on the taxing and spending power that it had in mind because “one of the specific evils feared by” the Framers of that Clause was that the taxing and spending power would be used to favor one religion over another or to support religion generally. Id., at 103-104 (relying exclusively upon Madison’s famous Memorial and Remonstrance Against Religious Assessments).
Because both prongs of its newly minted two-part test were satisfied, Flast held that the taxpayers had standing. Wallet Injury could not possibly have been the basis for this conclusion, since the taxpayers in Flast were no more able to prove that success on the merits would reduce their tax burden than was the taxpayer in Frothingham. Thus, Flast relied on Psychic Injury to support standing, describing the “injury” as the taxpayer’s allegation that “his tax money is being extracted and spent in violation of specific constitutional protections against such abuses of legislative power.” 392 U. S., at 106.
But that created a problem: If the taxpayers in Flast had standing based on Psychic Injury, and without regard to the effect of the litigation on their ultimate tax liability, why did not the taxpayers in Doremus and Frothingham have standing on a similar basis? Enter the magical two-pronged nexus test. It has often been pointed out, and never refuted, that the criteria in Flasfs two-part test are entirely unrelated to the purported goal of ensuring that the plaintiff has a sufficient “stake in the outcome of the controversy,” 392 U. S., at 103. See id., at 121-124 (Harlan, J., dissenting); see also id., at 107 (Douglas, J., concurring); United States v. Richardson, 418 U. S. 166, 183 (1974) (Powell, J., *624 concurring). In truth, the test was designed for a quite different goal. Each prong was meant to disqualify from standing one of the two prior cases that would otherwise contradict the holding of Flast. The first prong distinguished Doremus as involving a challenge to an “incidental expenditure of tax funds in the administration of an essentially regulatory statute,” rather than a challenge to a taxing and spending statute. See 392 U. S., at 102. Did the Court proffer any reason why a taxpayer’s Psychic Injury is less concrete and particularized, traceable, or redressable when the challenged expenditures are incidental to an essentially regulatory statute (whatever that means)? Not at all. Doremus had to be evaded, and so it was. In reality, of eourse, there is simply no material difference between Flast and Doremus as far as Psychic Injury is concerned: If taxpayers upset with the government’s giving money to parochial schools had standing to sue, so should the taxpayers who disapproved of the government’s paying public-school teachers to read the Bible.[2]
Flast’s dispatching of Frothingham via the second prong of the nexus test was only marginally less disingenuous. Not only does the relationship of the allegedly violated provision to the taxing and spending power have no bearing upon the concreteness or particularity of the Psychic Injury, see Part III, infra, but the existence of that relationship does *625 not even genuinely distinguish Flast from Frothingham. It is impossible to maintain that the Establishment Clause is a more direct limitation on the taxing and spending power than the constitutional limitation invoked in Frothingham, which is contained within the very provision creating the power to tax and spend. Article I, § 8, cl. 1, provides: “The Congress shall have Power To lay and collect Taxes . . . , to pay the Debts and provide for the common Defence and general Welfare of the United States.” (Emphasis added.) Though unmentioned in Flast, it was precisely this limitation upon the permissible purposes of taxing and spending upon which Mrs. Frothingham relied. See, e. g., Brief for Appellant in Frothingham, O. T. 1922, No. 962, p. 68 (“[T]he words ‘provide for the common defence and general welfare of the United States’ are used as limitations on the taxing power”)', id., at 26-81 (discussing the general welfare limitation at length).
3
Coherence and candor have fared no better in our later taxpayer-standing cases. The three of them containing lengthy discussion of the Establishment Clause warrant analysis.
Flast was dismissively and unpersuasively distinguished just 13 years later in Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U. S. 464 (1982). The taxpayers there challenged the decision of the Department of Health, Education, and Welfare to give a 77-acre tract of Government property, worth over half a million dollars, to a religious organization. Id., at 468. The Court, adhering to the strict letter of Flasts two-pronged nexus test, held that the taxpayers lacked standing. Flast’s first prong was not satisfied: Rather than challenging a congressional taxing and spending statute, the plaintiffs were attacking an agency decision to transfer federal property pursuant to Congress’s power under the Property Clause, Art. IV, §3, cl. 2. 454 U. S., at 479-480.
*626 In distinguishing between the Spending Clause and the Property Clause, Valley Forge achieved the seemingly impossible: It surpassed the high bar for irrationality set by Flast’s distinguishing of Doremus and Frothingham. Like the dissenters in Valley Forge, see 454 U. S., at 511-512 (opinion of Brennan, J.); id., at 513-514 (opinion of Stevens, J.), I cannot fathom why Article III standing should turn on whether the government enables a religious organization to obtain real estate by giving it a check drawn from general tax revenues or instead by buying the property itself and then transferring title.
While Valley Forge’s application of the first prong to distinguish Flast was unpersuasive, the Court was at least not trying to hide the ball. Its holding was forthrightly based on a resounding rejection of the very concept of Psychic Injury:
“[Plaintiffs] fail to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art. Ill, even though the disagreement is phrased in constitutional terms. It is evident that respondents are firmly committed to the constitutional principle of separation of church and State, but standing is not measured by the intensity of the litigant’s interest or the fervor of his advocacy.” 454 U. S., at 485-486 (emphasis deleted).
Of course, in keeping with what was to become the shameful tradition of our taxpayer-standing cases, the Court’s candor about the inadequacy of Psychic Injury was combined with a notable silence as to why Flast itself was not doomed.
A mere six years later, Flast was resuscitated in Bowen v. Kendrick, 487 U. S. 589 (1988). The taxpayers there *627 brought facial and as-applied Establishment Clause challenges to the Adolescent Family Life Act, which was a congressional scheme that provided grants to public or nonprofit private organizations to combat premarital adolescent pregnancy and sex. Id., at 593. The as-applied challenge focused on whether particular grantees selected by the Secretary of Health and Human Services were constitutionally permissible recipients. Id., at 620-622. The Solicitor General argued that, under Valley Forge’s application of Flast’s first prong, the taxpayers lacked standing for their as-applied claim because that claim was really a challenge to executive decisionmaking, not to Congress’s exercise of its taxing and spending power. 487 U. S., at 618-619. The Court rejected this contention, holding that the taxpayers’ as-applied claim was still a challenge to Congress’s taxing and spending power even though disbursement of the funds authorized by Congress had been administered by the Secretary. Id., at 619.
Kendrick, like Flast before it, was obviously based on Psychic Injury: The taxpayers could not possibly make, and did not attempt to make, the showing required for Wallet Injury. But by relying on Psychic Injury, Kendrick perfectly revealed the incompatibility of that concept with the outcome in Doremus. Just as Kendrick did not care whether the appropriated funds would have been spent anyway — given to a different, permissible recipient — so also Doremus should not have cared that the teachers would likely receive the same salary once their classroom activities were limited to secular conduct. Flast and Kendrick’s acceptance of Psychic Injury is fundamentally at odds with Frothingham, Doremus, and Valley Forge.
Which brings me to the final case worthy of mention. Last Term, in DaimlerChrysler Corp. v. Cuno, 547 U. S. 332 (2006), we concisely confirmed that Flast was based on Psychic Injury. The taxpayers in that case sought to rely on *628 Flast to raise a Commerce Clause challenge to a state franchise tax credit. 547 U. S., at 347. In rejecting the analogy and denying standing, we described Flast as follows:
“The Court... understood the ‘injur/ alleged in Establishment Clause challenges to federal spending to be the very ‘extraction] and spen[ding]’ of ‘tax mone/ in aid of religion alleged by a plaintiff. And an injunction against the spending would of course redress that injury, regardless of whether lawmakers would dispose of the savings in a way that would benefit the taxpayer-plaintiffs personally.” 547 U. S., at 348-349 (citation omitted; some alterations in original).
What Cuno’s conceptualization of Flast reveals is that there are only two logical routes available to this Court. We must initially decide whether Psychic Injury is consistent with Article III. If it is, we should apply Flast to all challenges to government expenditures in violation of constitutional provisions that specifically limit the taxing and spending power; if it is not, we should overturn Flast.
II
A
The plurality today avails itself of neither principled option. Instead, essentially accepting the Solicitor General’s primary submission, it limits Flast to challenges to expenditures that are “expressly authorized or mandated by . . . specific congressional enactment.” Ante, at 608. It offers no intellectual justification for this limitation, except that “[i]t is a necessary concomitant of the doctrine of stare decisis that a precedent is not always expanded to the limit of its logic.” Ante, at 615. That is true enough, but since courts purport to be engaged in reasoned decisionmaking, it is only true when (1) the precedent’s logic is seen to require narrowing or readjustment in light of relevant distinctions that the new fact situation brings to the fore; or (2) its logic is funda *629 mentally flawed, and so deserves to be limited to the facts that begot it. Today’s plurality claims neither of these justifications. As to the first, the plurality offers no explanation of why the factual differences between this case and Flast are material. It virtually admits that express congressional allocation vel non has nothing to do with whether the plaintiffs have alleged an injury in fact that is fairly traceable and likely to be redressed. See ante, at 609-610. As the dissent correctly contends and I shall not belabor, see post, at 689-640 (opinion of Souter, J.), Flast is indistinguishable from this case for purposes of Article III. Whether the challenged government expenditure is expressly allocated by a specific congressional enactment has absolutely no relevance to the Article III criteria of injury in fact, traceability, and redressability.
Yet the plurality is also unwilling to acknowledge that the logic of Flast (its Psychic Injury rationale) is simply wrong, and for that reason should not be extended to other cases. Despite the lack of acknowledgment, however, that is the only plausible explanation for the plurality’s indifference to whether the “distinguishing” fact is legally material, and for its determination to limit Flast to its “ ‘resul[tj,’” ante, at 610.[3] Why, then, pick a distinguishing fact that may breathe life into Flast in future cases, preserving the disreputable disarray of our Establishment Clause standing jurisprudence? Wby not hold that only taxpayers raising Establishment Clause challenges to expenditures pursuant to the Elementary and Secondary Education Act of 1965 have *630 standing? That, I suppose, would be too obvious a repudiation of Flast, and thus an impediment to the plurality’s pose of minimalism.
Because the express-allocation line has no mooring to our tripartite test for Article III standing, it invites demonstrably absurd results. For example, the plurality would deny standing to a taxpayer challenging the President’s disbursement to a religious organization of a discrete appropriation that Congress had not explicitly allocated to that purpose, even if everyone knew that Congress and the President had informally negotiated that the entire sum would be spent in that precise manner. See ante, at 608, n. 7 (holding that nonstatutory earmarks are insufficient to satisfy the express-allocation requirement). Ánd taxpayers should lack standing to bring Establishment Clause challenges to the Executive Branch’s use of appropriated funds when those expenditures have the added vice of violating congressional restrictions. If, for example, Congress instructs the President to disburse grants to hospitals that he deems worthy, and the President instead gives all of the money to the Catholic Church, “[t]he link between congressional action and constitutional violation that supported taxpayer standing in Flast [would be] missing.” Ante, at 605. Indeed, taking the plurality at its word, Congress could insulate the President from all Flast-based suits by codifying the truism that no appropriation can be spent by the Executive Branch in a manner that violates the Establishment Clause.
Any last pretense of minimalism — of adhering to prior law but merely declining to “extend” it — is swept away by the fact that the Court’s holding flatly contradicts Kendrick. The whole point of the as-applied challenge in Kendrick was that the Secretary, not Congress, had chosen inappropriate grant recipients. 487 U. S., at 620-622. Both Kendrick and this case equally involve, in the relevant sense, attacks on executive discretion rather than congressional decision: Congress generally authorized the spending of tax funds for cer *631 tain purposes but did not explicitly mandate that they be spent in the unconstitutional manner challenged by the taxpayers. I thus share the dissent’s bewilderment, see post, at 640-641, as to why the plurality fixates on the amount of additional discretion the Executive Branch enjoys under the law beyond the only discretion relevant to the Establishment Clause issue: whether to spend taxpayer funds for a purpose that is unconstitutional. See ante, at 615 (focusing on whether the case involves “a purely discretionary Executive Branch expenditure” (emphasis added)).
B
While I have been critical of the Members of the plurality, I by no means wish to give the impression that respondents’ legal position is any more coherent. Respondents argue that Flast did not turn on whether Congress has expressly allocated the funds to the allegedly unconstitutional use, and their case plainly rests on Psychic Injury. They repeatedly emphasize that the injury in Flast was merely the governmental extraction and spending of tax money in aid of religion. See, e.g., Brief for Respondents 28. Respondents refuse to admit that their argument logically implies, for the reasons already discussed, that every expenditure of tax revenues that is alleged to violate the Establishment Clause is subject to suit under Flast.
Of course, such a concession would run headlong into the denial of standing in Doremus. Respondents’ only answer to Doremus is the cryptic assertion that the injury there was not fairly traceable to the unconstitutional conduct. Brief for Respondents 21, and n. 7. This makes no sense. On Flasts theory of Psychic Injury, the injury in Doremus was perfectly traceable and not in any way attenuated. It consisted of the psychic frustration that tax funds were being used in violation of the Establishment Clause, which was directly caused by the paying of teachers to read the Bible, and which would have been remedied by prohibition of that *632 expenditure.[4] The hollowness of respondents’ traceability argument is perhaps best demonstrated by their counsel’s game submission at oral argument that there would be standing to challenge the hiring of a single Secret Service agent who guarded the President during religious trips, but no standing if those responsibilities (and the corresponding taxpayer-funded compensation) were spread out over the entire Secret Service protective detail. Tr. of Oral Arg. 38-39.
The logical consequence of respondents’ position finds no support in this Court’s precedents or our Nation’s history. Any taxpayer would be able to sue whenever tax funds were used in alleged violation of the Establishment Clause. So, for example, any taxpayer could challenge the fact that the Marshal of our Court is paid, in part, to call the courtroom to order by proclaiming “God Save the United States and this Honorable Court.” As much as respondents wish to deny that this is what Flast logically entails, it blinks reality to conclude otherwise. If respondents are to prevail, they must endorse a future in which ideologically motivated taxpayers could “roam the country in search of governmental wrongdoing and... reveal their discoveries in federal court,” transforming those courts into “ombudsmen of the general welfare” with respect to Establishment Clause issues. Valley Forge, 454 U. S., at 487.
C
Ultimately, the arguments by the parties in this case and the opinions of my colleagues serve only to confirm that Flast’s adoption of Psychic Injury has to be addressed head- *633 on. Minimalism is an admirable judicial trait, but not when it comes at the cost of meaningless and disingenuous distinctions that hold the sure promise of engendering further meaningless and disingenuous distinctions in the future. The rule of law is ill served by forcing lawyers and judges to make arguments that deaden the soul of the law, which is logic and reason. Either Flast was correct, and must be accorded the wide application that it logically dictates, or it was not, and must be abandoned in its entirety. I turn, finally, to that question.
Ill
Is a taxpayer’s purely psychological displeasure that his funds are being spent in an allegedly unlawful manner ever sufficiently concrete and particularized to support Article III standing? The answer is plainly no.
As I noted at the outset, Lujan explained that the “consistent]” view of this Court has been that “a plaintiff raising only a generally available grievance about government— claiming only harm to his and every citizen’s interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large — does not state an Article III case or controversy.” 504 U. S., at 573-574. As evidence of the consistency with which we have affirmed that understanding, Lujan relied on the reasoning in Frothingham, and in several other cases, including Ex parte Lévitt, 302 U. S. 633 (1937) (per curiam) (dismissing suit challenging Justice Black’s appointment to this Court in alleged violation of the Ineligibility Clause, Art. I, § 6, cl. 2), United States v. Richardson, 418 U. S. 166 (1974) (denying standing to challenge the Government’s failure to disclose the CIA’s expenditures in alleged violation of the Accounts Clause, Art. I, § 9, cl. 7), and Schlesinger v. Reservists Comm. to Stop the War, 418 U. S. 208 (1974) (rejecting challenge to Members of Congress holding commissions in the military Reserves in alleged violation of the Incompatibility Clause, Art. I, §6, cl. 2). See *634 504 U. S., at 573-577. Just this Term, relying on precisely the same cases and the same reasoning, we held unanimously that suits raising only generalized grievances do not satisfy Article Ill’s requirement that the injury in fact be concrete and particularized. See Lance, 549 U. S., at 439-441.[5]
Nor does Flast’s limitation on Psychic Injury — the limitation that it suffices only when the two-pronged “nexus” test is met — cure the Article III deficiency. The fact that it is the alleged violation of a specific constitutional limit on the taxing and spending power that produces the taxpayer’s mental angst does not change the ftmdamental flaw. It remains the case that the taxpayer seeks “relief that no more directly and tangibly benefits him than it does the public at large.” Lujan, supra, at 573-574. And it is of no conceivable relevance to this issue whether the Establishment Clause was originally conceived of as a specific limitation on the taxing and spending power. Madison’s Remonstrance has nothing whatever to say on the question whether suits alleging violations of that limitation are anything other than the generalized grievances that federal courts had always been barred from considering before Flast Flast was forced to rely on the slim reed of the Remonstrance since there was no better support for its novel conclusion, in 1968, that violation of the Establishment Clause, unique among the provisions of our law, had always inflicted a personalized Psychic Injury upon all taxpayers that federal courts had the power to remedy.
Moreover, Flast is damaged goods, not only because its fanciful two-pronged “nexus” test has been demonstrated to be irrelevant to the test’s supposed objective, but also be *635 cause its cavalier treatment of the standing requirement rested upon a fundamental underestimation of that requirement’s importance. Flast was explicitly and erroneously premised on the idea that Article III standing does not perform a crucial separation-of-powers function:
“The question whether a particular person is a proper party to maintain the action does not, by its own force, raise separation of powers problems related to improper judicial interference in areas committed to other branches of the Federal Government. Such problems arise, if at all, only from the substantive issues the individual seeks to have adjudicated. Thus, in terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.” 392 U. S., at 100-101.
A perceptive Frenchman, visiting the United States some 135 years before Chief Justice Warren wrote these words, perceived that they were false.
“It is true that . . . judicial censure, exercised by the courts on legislation, cannot extend without distinction to all laws, for there are some of them that can never give rise to the sort of clearly formulated dispute that one calls a case.” A. de Tocqueville, Democracy in America 97 (H. Mansfield & D. Winthrop transís, and eds. 2000) (emphasis added).
Flast’s crabbed (and judge-empowering) understanding of the role Article III standing plays in preserving our system of separated powers has been repudiated:
“To permit a complainant who has no concrete injury to require a court to rule on important constitutional issues in the abstract would create the potential for abuse of the judicial process, distort the role of the Judi *636 ciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing ‘government by injunction.’” Schlesinger, 418 U. S., at 222.
See also Richardson, 418 U. S., at 179-180; Valley Forge, 454 U. S., at 474; Lujan, supra, at 576-577. We twice have noted explicitly that Flast failed to recognize the vital separation-of-powers aspect of Article III standing. See Spencer v. Kemna, 523 U. S. 1, 11-12 (1998); Lewis v. Casey, 518 U. S. 343, 353, n. 3 (1996). And once a proper understanding of the relationship of standing to the separation of powers is brought to bear, Psychic Injury, even as limited in Flast, is revealed for what it is: a contradiction of the basic propositions that the function of the judicial power “is, solely, to decide on the rights of individuals,” Marbury v. Madison, 1 Cranch 137, 170 (1803), and that generalized grievances affecting the public at large have their remedy in the political process.
Overruling prior precedents, even precedents as disreputable as Flast, is nevertheless a serious undertaking, and I understand the impulse to take a minimalist approach. But laying just claim to be honoring stare decisis requires more than beating Flast to a pulp and then sending it out to the lower courts weakened, denigrated, more incomprehensible than ever, and yet somehow technically alive. Even before the addition of the new meaningless distinction devised by today’s plurality, taxpayer standing in Establishment Clause cases has been a game of chance. In the proceedings below, well-respected federal judges declined to hear this case en banc, not because they thought the issue unimportant or the panel decision correct, but simply because they found our cases so lawless that there was no point in, quite literally, second-guessing the panel. See Freedom From Religion Foundation, Inc. v. Chao, 447 F. 3d 988 (CA7 2006) (Flaum, C. J., concurring in denial of rehearing en banc); id., at 989- *637 990 (Easterbrook, J., concurring in denial of rehearing en banc) (describing our cases as “arbitrary,” “illogical,” and lacking in “comprehensiveness and rationality”). We had an opportunity today to erase this blot on our jurisprudence, but instead have simply smudged it.
My call for the imposition of logic and order upon this chaotic set of precedents will perhaps be met with the snappy epigram that “[t]he life of the law has not been logic: it has been experience.” O. Holmes, The Common Law 1 (1881). But what experience has shown is that Flast’s lack of a logical theoretical underpinning has rendered our taxpayer-standing doctrine such a jurisprudential disaster that our appellate judges do not know what to make of it. And of course the case has engendered no reliance interests, not only because one does not arrange his affairs with an eye to standing, but also because there is no relying on the random and irrational. I can think of few cases less warranting of stare decisis respect. It is time — it is past time — to call an end. Flast should be overruled.

 The text of the statute did not just authorize public-school teachers to read from the Bible, but mandated that they do so: “At least five verses taken from that portion of the Holy Bible known as the Old Testament shall be read, or caused to be read, without comment, in each public school classroom, in the presence of the pupils therein assembled, by the teacher in charge, at the opening of school upon every school day----” N. J. Rev. Stat. §18:14-77 (1937) (emphasis added).

 There is a natural impulse to respond that the portion of the teachers’ salary that corresponded to the time that they were required to read from the Bible was de minimis. But even Flast had the decency not to seize on a de minimis exception to distinguish Doremus: Having relied exclusively on Madison’s Remonstrance to justify the conclusion that the Establishment Clause was a specific limitation on the taxing and spending power, see Flast, 392 U. S., at 103-104, the Court could not simultaneously ignore Madison’s admonition that ‘“the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever,’” id., at 103 (quoting Madison’s Remonstrance; emphasis added).

 This explanation does not suffice with regard to Justice Kennedy, who, unlike the other Members of the plurality, openly and avowedly contends both that Flast was correctly decided and that respondents should nevertheless lose this case. Ante, at 616 (concurring opinion). He thus has the distinction of being the only Justice who affirms both propositions. I cannot begin to comprehend how the amorphous separation-of-powers concerns that motivate him, ante, at 615-618, bear upon whether the express-allocation requirement is grounded in the Article III criteria of injury in fact, traceability, or redressability.

 Nor is the dissent’s oblique suggestion that Doremus did not involve an “identifiable amoun[t]” of taxpayer funds, post, at 639, any more persuasive. One need not consult a CPA to realize that the portion of the school-day during which the teachers’ educational responsibilities were to read the Bible corresponded to a fraction of the teachers’ taxpayer-funded salaries. And while the amount of money might well have been inconsequential, it was probably greater than three pence. See n. 2, supra.

 It is true that this Court has occasionally in dicta described the prohibition on generalized grievances as merely a prudential bar. But the fountainhead of this dicta, Warth v. Seldin, 422 U. S. 490 (1975), supported its statement only by naked citation of Schlesinger, Richardson, and Lévitt. 422 U. S., at 499. And those cases squarely rested on Article III considerations, as the analysis in Lujan and Lance confirms.